Chief Judge Breitel.
This appeal, in arbitration, involves a so-called "job security” clause in a collective agreement between a public employer and public employees. The Yonkers City Board of Education, because of the city’s severe financial stringency, terminated the services of some teachers covered by the "job security” clause. The Yonkers City School District is not "independent” but receives its funds from the City of Yonkers.
The teachers’ union demanded arbitration under the collective agreement and the board brought this proceeding to stay arbitration (CPLR art 75). Supreme Court granted the stay and declared the job security provision invalid as contrary to public policy. The Appellate Division affirmed and the teachers’ union appeals.
The issue is whether a public employer is free to bargain voluntarily about job security and also free, under the collective agreement’s provisions, to submit to arbitration disputes about job security.
There should be a reversal. A provision in a collective agreement guaranteeing public employees job security for a reasonable period of time is not prohibited by any statute or controlling decisional law and is not contrary to public policy. *272 Hence, the board of education was free to bargain voluntarily about job security and was also, therefore, free to agree to arbitration of prospective disputes about job security.
In November, 1974, the board of education and the teachers’ union entered into a collective agreement covering the period from July 1, 1974 to June 30, 1977. Section A of article VIII of the agreement provides: "During the life of this contract no person in this bargaining unit shall be terminated due to budgetary reasons or abolition of programs but only for unsatisfactory job performance as provided for under the Tenure Law.” Article XIII contains relatively broad grievance and arbitration clauses (§ A, subd 2; § C, subd 3, par a).
In October, 1975, faced with sharp cuts in its budget made by the City of Yonkers, the board of education decided to lay off approximately 50 of its employees, including a number of teachers. The teachers’ union filed a grievance with the acting superintendent, which was denied, and then demanded arbitration. On October 28, 1975, the board brought this proceeding for a stay of arbitration.
In November, 1975, the Legislature passed, and the Governor approved, the New York State Financial Emergency Act for the City of Yonkers (L 1975, ch 871). The financial condition of the city was declared to be a "disaster” (§ 1). The city was directed to develop an 18-month plan to balance the municipal budget by July 1, 1977 and to repay its creditors (New York State Financial Emergency Act for the City of Yonkers, § 8, subd 1). In developing the plan the city was required to seek a stabilization of its work force and, to the extent that a reduction in the work force was necessary, attrition was to be the primary means to accomplish the reduction (§ 8, subd 2). The statute further provides that "[njothing contained in this act shall be construed to impair the right of employees to organize or to bargain collectively” (§ 3, subd 3). The Emergency Financial Control Board was .created and empowered to oversee the city’s efforts and to approve the financial plan (§ 8, subd 3).
After the passage of the Financial Emergency Act and Supreme Court’s subsequent decision denying the stay of arbitration, further layoffs occurred.
The teachers’ union contends that neither statute nor controlling decisional law, nor public policy, prohibited the board from voluntarily negotiating, before the onset of the legisla *273 tively declared emergency, about job security and agreeing to submit to arbitration disputes about job security.
Section 200 of the Civil Service Law provides: "The legislature of the state of New York declares that it is the public policy of the state and the purpose of this act to promote harmonious and cooperative relationships between government and its employees and to protect the public by assuring, at all times, the orderly and uninterrupted operations and functions of government. These policies are best effectuated by (a) granting to public employees the right of organization and representation, (b) requiring the state, local governments and other political subdivisions to negotiate with, and enter into written agreements with employee organizations representing public employees which have been certified or recognized, (c) encouraging such public employers and such employee organizations to agree upon procedures for resolving disputes”. It has been held that, as a matter of public policy, an authorized procedure for resolving labor disputes is arbitration (Board of Educ. v Bellmore-Merrick United Secondary Teachers, 39 NY2d 167, 171; Matter of Associated Teachers of Huntington v Board of Educ., 33 NY2d 229, 236).
Under article 14 of the Civil Service Law (Taylor Law), public employers are required to negotiate collectively with public employee organizations in determining the "terms and conditions of employment” (Civil Service Law, § 204, subd 2). But this is not the limit of the public employer’s power. To effectuate the public policy favoring negotiation as the means of insuring "harmonious and cooperative relationships between government and its employees”, a public employer possesses broad power voluntarily to negotiate all matters in controversy, whether or not they involve "terms and conditions of employment” subject to mandatory bargaining, and to agree to submit such controversies to arbitration (see Board of Educ. v Associated Teachers of Huntington, 30 NY2d 122, 130).
The public employer’s power to bargain collectively, while broad, is not unlimited. Although a public employer is free to negotiate any matter in controversy, whether or not it involves a term or condition of employment subject to mandatory bargaining, it may do so only in the absence of "plain and clear” prohibitions in statute or controlling decision law, or restrictive public policy (see Matter of Susquehanna Val. Cent. School Dist. at Conklin [Susquehanna Val. Teachers’ *274 Assn.], 37 NY2d 614, 616-618; Syracuse Teachers Assn. v Board of Educ., 35 NY2d 743, 744; Board of Educ. v Associated Teachers of Huntington, 30 NY2d 122, 130, supra).
The controversy in the Susquehanna case (supra) involved teacher staff size. The school district in a collective agreement had agreed to a stabilization of staff size, thus providing staff members with "job security” for the duration of the contract. In its 1973-1974 school budget, however, the school district abolished a number of staff positions. The teachers sought arbitration. On appeal, this court found no statute or controlling decisional law, nor any restrictive public policy, limiting the board of education’s freedom to contract about staff size. Thus, the court held that the board was free to agree to submit to arbitration disputes about staff size.
The Susquehanna case (supra) is dispositive of the instant case. There is no statute or controlling decisional law or other source of public policy prohibiting a public employer from voluntarily agreeing to submit controversies over staff size or "job security” to arbitration (see Matter of Brookhaven-Comsewogue Union Free School Dist. v Port Jefferson Sta. Teachers Assn., 86 Misc 2d 620).
Matter of Lippmann v Delaney (48 AD2d 913), decided by a divided court and relied upon by the board of education, was incorrectly decided (see, also, Matter of Carmel Cent. School Dist. [Carmel Teachers Assn.] 76 Misc 2d 63, 66-67). In the Lippmann case (supra), it was held that, since the public employer has the statutory power to abolish positions in good faith, it does not surrender that power in a collective bargaining agreement unless the abolition of a position constitutes a term or condition of employment and thus is subject to mandatory collective bargaining. Relying upon past determinations by the Public Employment Relations Board, the court concluded that abolition of a position was not a term or condition of employment and thus was not a proper subject of a collective bargaining agreement.
In the Lippmann case (supra), Mr. Justice Hopkins, joined by Mr. Justice Brennan, dissented. The dissenters correctly perceived the distinction between terms or conditions of employment which are subject to mandatory collective bargaining under the Taylor Law, and matters in controversy which, although not subject to mandatory bargaining, may voluntarily be included within a collective agreement by a public employer (see Matter of Susquehanna Val. Cent. School Dist. *275 at Conklin [Susquehanna Val. Teachers’ Assn.], 37 NY2d 614, 616, supra, for an elaboration of the distinction). As to such matters in controversy, the dissenters noted that the scope of the public employer’s power to include them within a collective agreement is limited by plain and clear prohibitions in statute or decisional law (48 AD2d, at p 915). Thus, Mr. Justice Hopkins stated (p 916): "The enlightened attitude of the [public employer] in making an agreement to protect its long-term employees who might be adversely affected by a reorganization should not be equated with a refusal of a municipality to negotiate terms freezing positions or salaries.”
The board also contends that the Financial Emergency Act evinces a legislative determination of public policy that job abolition must be permitted in this case. In fact, quite the contrary is true.
The act evidences no policy favoring abrogation of collective agreements and abolition of teacher positions. As noted earlier, the act provides that it should not be construed to impair the right of employees to bargain collectively and specifies that primary recourse must be had to attrition to effect any reduction in the work force. Indeed, the overriding purpose of the act was to protect those who had entered into agreements with the city and to insure that these agreements would be kept, not only bondholders and noteholders, but all others who had engaged in contractual arrangements with the city.
A job security provision insures that, at least for the duration of the agreement, the employee need not fear being put out of a job. Such absence of fear may be critical to the maintenance and efficiency of public employment, just as the fear of inability to meet its debts may destroy the credit of the municipality. A job security clause is useless if the public employer is free to disregard it when it is first needed.
This is not to say, however, that all job security clauses are valid and enforceable or that they are valid and enforceable under all circumstances. Notably, the job security clause involved in this case and the staff size clause in the Susquehanna case (supra) were of relatively brief duration, three years and two years, respectively. Nor were the clauses negotiated in a time of financial emergency between parties of unequal bargaining power. Most important, the job security clause in the instant case is explicit in its protection of the teachers from abolition of their positions due to budgetary stringencies (compare the clauses involved in this case and in *276 Matter of Burke v Bowen, 40 NY2d 264, decided herewith, with the clause involved in Yonkers School Crossing Guard Union v City of Yonkers, 39 NY2d 964, decided herewith).
Of course, collective bargaining agreements, and particularly job security clauses, do not derive from a "higher law” giving them a status denied to other public and contractual arrangements. To paraphrase language in another context, a collective bargaining agreement may not become a "suicide pact”, as has been said of the Constitution. Ultimately, the saving of a municipality from bankruptcy is equally important to its employees as it is to its banking creditors, or to its citizenry. In bankruptcy all obligations may suffer impairment or dissolution, job security clauses included. But the collective agreement in question, negotiated before a legislatively declared emergency, short-term in length, and indistinguishable from the city’s other contractual obligations which remain enforceable, is not yet vulnerable to attack as in violation of public policy.
Consequently, in this arbitration proceeding, the court has no power to pass upon the merits of the dispute (CPLR 7501). The merits are for the arbitrators to decide. It is also for the arbitrators to fashion the remedy appropriate to the circumstances, if it is determined that the agreement has been breached. In this context, of course, the financial condition of the city and its ability to fund the teaching positions are relevant and may be considered. But since there is no statute or controlling decisional law, or public policy prohibiting a public employer from voluntarily agreeing to a job security clause, the clause was valid and the parties should proceed to arbitration.
On this analysis, it is unnecessary, if it is at all relevant, to reach the constitutional question of whether the employer’s action constituted an impairment of the contract between the parties.
Accordingly, the order of the Appellate Division should be reversed, with costs, the application for a stay of arbitration denied, and the cross motion to compel arbitration granted.
Judges Jasen, Gabrielli, Jones, Wachtler, Fuchsberg and Cooke concur.
Order reversed, etc.