RIDGEFIELD PARK EDUCATION ASSOCIATION, PLAINTIFF-RESPONDENT, v. RIDGEFIELD PARK BOARD OF EDUCATION, DEFENDANT-APPELLANT.

Argued March 6, 1978—Decided August 2, 1978.

146

Mr. *Lester Aron* argued the cause for appellant (*Messrs. Pachman, Aron & Till* and *Mr. John T. Barbour,* attorneys; *Mr. Barbour* on the brief).

Mr. *Theodore M. Simon* argued the cause for respondent (*Messrs. Goldberg and Simon,* attorneys; *Mr. Simon* and *Mr. Louis P. Bucceri,* on the brief).

Ms. *Mary Ann Burgess,* Deputy Attorney General, argued the cause for *amicus curiae* New Jersey State Commissioner of Education (*Mr. John J. Degnan,* Attorney General of New Jersey, attorney; *Mr. Stephen Skillman,* Assistant Attorney General, of Counsel; *Ms. Burgess* and *Mr. Mark Schorr,* Deputy Attorney General, on the brief).

The opinion of the court was delivered by

PASHMAN, J. At issue herein is whether the 1974 amendments to the New Jersey Employer-Employee Relations Act, *L.* 1968, *c.* 303, as amended by *L.* 1974, *c.* 123, *N. J. S. A.* 34:13A–1 *et seq.* (the Act), created a class of permissively negotiable matters which, while not qualifying as mandatorily negotiable terms and conditions of employment, are nevertheless negotiable on a voluntary basis. The Public Employment Relations Commission (PERC) has concluded that such a permissive category indeed exists. *See In re Bd. of Ed. of the Borough of Fair Lawn,* PERC No. 76–7, 1 *NJPER* 47, 48 n. 9 (1975). PERC has also determined that disputes involving provisions of collectively negotiated agreements covering permissive matters may be resolved by binding arbitration if the matter is otherwise arbitrable, as is the case with those covering mandatorily negotiable matters. *In re Ridgefield Park Bd. of Ed.,* PERC No. 78–9, 3 *NJPER* 319, 320 (1977); *In re Bd. of Ed. of City of Trenton,* PERC No. 77–24, 2 *NJPER* 351, 352 (1976); *In re Bridgewater-Raritan Regional Bd. of Ed.,* PERC No. 77–21, 3 NJPER 23, 25 (1976). The public employer herein contends that with respect to the issue of negotiability there are but two types of subjects — those as to which collective negotiation is mandatory and those as to which it is unlawful. The former category is comprised of those subjects which pertain to the terms and conditions of public employment while the latter includes all other subjects. It claims that any provision of a negotiated agreement which concerns subjects in the latter category is *ultra vires* and thus unenforceable.

The facts of this case are not in dispute. The collective agreement between plaintiff Association, the majority representative of the Board's teaching employees, and the defendant Board, which ran until July 1, 1977, defined a grievance as follows:

The term, "grievance," means a complaint by an employee, group of employees, or the Association, that, as to him, there has been an

inequitable, improper, or unjust application, interpretation, or violation of a policy, agreement, or administrative decision.

The contract provided for binding arbitration as the terminal step in the grievance process:

In the event the aggrieved party is dissatisfied with the determination of the Board he shall have the right to request arbitration pursuant to rules and regulations established by the Public Employment Relations Commission under the provisions of Chapter 303, Public Laws of 1968. The findings of the arbitrator shall be binding on all parties.

The collective agreement included a provision governing the subject of teacher transfers and reassignments.

*ARTICLE XIV — Voluntary and Involuntary Transfers and Reassignments —*

A. Employees who desire a change in grade and/or subject assignment or who desire to transfer to another building may file a written statement(s) of such desire with the superintendent. Such statement(s) shall include the grade and/or subject to which the employee desires to be assigned and the school or schools to which he desires to be transferred, in order of preference.

As soon as practicable, and in no case later than June 1, the superintendent shall post in each school and deliver to the Association a system-wide schedule showing the names of all employees who have been reassigned or transferred and the nature of such reassignment or transfer.

B. In the determination of requests for voluntary reassignments and/or transfers, the wishes of the individual employee shall be honored, upon the recommendation of the superintendent and approval of the Board, to the extent that the transfer or reassignment does not conflict with the instructional requirements and best interests of the school system.

C. Notice of an involuntary transfer or reassignment shall be given to the employee as far in advance as practicable. In the case of teachers, except in an emergency situation, notice shall be given not later than April 30.

During the 1975–1976 and 1976–1977 school years certain teachers were involuntarily reassigned to teach courses or grades which they did not wish to teach, were refused a

desired transfer to a different school, or were involuntarily transferred to another school. The Association filed grievances on behalf of these teachers. The Board denied all of them. The Association then sought to have these grievances resolved by binding arbitration, pursuant to the contractual arbitration clause. See *ante* at 150. The Board contended that the grievances pertained to matters outside the legal scope of negotiations, and hence were not arbitrable.

The Association instituted this action under *N. J. S. A.* 2A:24-1 and 3 seeking an order from the Chancery Division compelling the Board to submit the grievances involving transfers and reassignments to binding arbitration. The Board made a cross-application for an order enjoining the arbitrations. In the proceedings before the Chancery Judge, the Board admitted that it had a contractual duty to arbitrate the disputes herein, but submitted that the real issue was the legality of arbitrating these matters. The Board's request that the case be transferred to PERC for a decision on the negotiability of the issues involved in the grievances was denied. On March 4, 1977 the Chancery Division rendered an oral opinion adverse to the Board. On March 22, 1977 the Chancery Judge issued a judgment and order that the parties proceed to arbitration.

On March 2, 1977 the Board had filed a Petition for Scope-of-Negotiations Determination with PERC pursuant to *N. J. S. A.* 34:13A-5.4(d). It sought an order from PERC enjoining arbitration on both an interim basis and on a permanent basis. The interim request was denied in an interlocutory decision on April 5, 1977. PERC No. 77-45, 3 NJPER 150. This denial was based on PERC's determination that its decisions in *In re Bridgewater-Raritan Regional Bd. of Ed., supra,* and *In re Bd. of Ed. of City of Trenton, supra,* mandated a conclusion that the matters in issue, though permissive and not mandatorily negotiable, would be arbitrable if otherwise within the contractual arbitration clause.

Meanwhile, the Board obtained a temporary stay of the enforcement of the Chancery judgment in order to enable it to apply for a stay from the Appellate Division. On April 20, 1977 a single judge of the Appellate Division denied the motion for a stay. However, arbitration had not commenced as of July 7, 1977, when a full panel of the Appellate Division granted the Board's motion for a stay.

PERC gave the matter a full hearing and issued its scope determination on August 17, 1977. PERC No. 78–9, 3 *NJPER* 319 (1977). PERC reaffirmed its earlier holding in *In re Bridgewater-Raritan Bd. of Ed., supra,* 3 *NJPER* at 25, that in enacting *L.* 1974, *c.* 123, the Legislature reacted to the restrictiveness of the standards enunciated by this Court in *Dunellen Bd. of Ed. v. Dunellen Ed. Ass'n,* 64 *N. J.* 17 (1973), concerning negotiability and arbitrability in the public sector. PERC observed that the critical factor in the Court's *Dunellen* holding was the *L.* 1968, *c.* 303 version of *N. J. S. A.* 34:13A–8.1, which provided, in effect, that negotiated agreements could not "annul or modify any statute or statutes of this State." Thus, great significance was ascribed to *L.* 1974, *c.* 123, § 6, which amended that statute effectively to provide that no negotiated agreement could "annul or modify any *pension* statute or statutes of this State." PERC also cited pertinent language from the 1974 amendments to *N. J. S. A.* 34:13A–5.3, which establishes the primacy of the negotiated grievance procedures in dispute resolution:

Notwithstanding any procedures for the resolution of disputes, controversies or grievances established by any other statute, grievance procedures established by agreement between the public employer and the representative organization *shall be utilized* for any dispute covered by the terms of such agreement. (emphasis added)

PERC concluded that one of the purposes of *L.* 1974, *c.* 123 was to expand the scope of arbitrable issues. So long as no specific statutes are violated and no overriding public

policy contravened, PERC was of the opinion that both negotiation and arbitration of permissive matters are acceptable. In support of this view, PERC cited *In re Bd. of Ed. of City of Trenton, supra,* 2 *NJPER* at 352, where it had found that involuntary employee transfers were not precluded from negotiation by statute and were thus a permissible subject of negotiation, and *In re Bd. of Ed. of the Borough of Verona, PERC* No. 77–42, 3 *NJPER* 80 (1977), where it had found that a Board's decision to replace a teacher's non-teaching duty period with a classroom teaching period was also a permissibly negotiable subject. PERC held that the disputes herein were permissively negotiable and thus arbitrable if otherwise arbitrable under the agreement. 3 *NJPER* at 320–321.

The Board filed a motion for direct certification on July 18, 1977. On July 27, 1977 the Association appealed to this Court to vacate the interlocutory stay issued by the Appellate Division. In the alternative the Association requested direct certification. We directly certified this case while it was pending unheard in the Appellate Division, 75 *N. J.* 584 (1977).

I

Before we address the merits, some guidelines regarding proper procedure in these cases should be set. Under our existing legislative scheme it may be necessary to go to both PERC and the Superior Court in order to completely resolve a disagreement concerning the arbitrability of a particular dispute. When one party claims that a given dispute is arbitrable under the contract and the other party resists arbitration, the party desiring arbitration should seek an order from the Superior Court compelling arbitration. See *N. J. S. A.* 2A:24-1 *et seq.* Where the trial judge determines that the real controversy is not one of contractual ar-

bitrability, but rather concerns the propriety of the parties negotiating and agreeing on the item in dispute, he should refrain from passing on the merits of that issue.

PERC has primary jurisdiction to make a determination on the merits of the question of whether the subject matter of a particular dispute is within the scope of collective negotiations. *N. J. S. A.* 34:13A–5.4(d). *See State v. State Supervisory Employees Ass'n,* 78 *N. J.* 54 (1978); *Bd. of Ed. of Plainfield v. Plainfield Ed. Ass'n,* 144 *N. J. Super.* 521, 524–526 (App. Div. 1976); *Newark Teachers Union v. Bd. of Ed. of Newark,* 149 *N. J. Super.* 367, 374–375 (Ch. Div. 1977). However, the reach of this decision is limited. PERC discussed this point in *In re Hillside Bd. of Ed.,* PERC No. 76–11, 1 *NJPER* 55, 57 (1975):

> The Commission is addressing the abstract issue: is the subject matter in dispute within the scope of collective negotiations. Whether that subject is within the arbitration clause of the agreement, whether the facts are as alleged by the grievant, whether the contract provides a defense for the employer's alleged action, or even whether there is a valid arbitration clause in the agreement, or any other question which might be raised is not to be determined by the Commission in a scope proceeding. Those are questions appropriate for determination by an arbitrator and/or the courts.

Of course, where the existence of a contractual obligation to arbitrate is not contested, the parties need only go to PERC for a ruling on whether the subject matter of the dispute whose grievability is contested is within the scope of collective negotiations. PERC can then afford complete relief. If PERC concludes that the dispute is within the legal scope of negotiability and agreement between the employer and employees, the matter may proceed to arbitration. Where PERC concludes that a particular dispute is not within the scope of collective negotiations, and thus not arbitrable, it must issue an injunction permanently restraining arbitration. *See Bd. of Ed. of Englewood v. Englewood Teachers,* 135 *N. J. Super.* 120, 124 (App. Div. 1975). Moreover, we agree with the decision in *Bd. of Ed. of Englewood v. Engle-*

*wood Teachers, supra,* that PERC is empowered to order that arbitration proceedings be suspended during the pendency of a scope-of-negotiations proceeding. Where necessary, PERC may go to the Appellate Division to seek an appropriate order to compel compliance with its orders in scope proceedings. *N. J. S. A.* 34:13A-5.4(f). Where a party disagrees with PERC's determination on the scope question, an appeal to the Appellate Division is expressly authorized. *N. J. S. A.* 34:13A-5.4(d).

██ We agree with PERC that contract interpretation is a question for judicial resolution. Thus, where a party resists an attempt to have a dispute arbitrated, it may go to the Superior Court for a ruling on the issue of its contractual obligation to arbitrate. However, the issue of contractual arbitrability may not be reached if the threshold issue of whether the subject matter of the grievance is within the scope of collective negotiations is contested. In that event, a ruling on that issue must be obtained from PERC. Thus, the preferable procedure in the instant case would have been for PERC to have rendered its scope determination before the issue of contractual arbitrability was addressed. Where an item is within the scope of collective negotiations, and a court determines that the agreement contains a valid arbitration clause, the matter must proceed to arbitration.

The arbitrator's function is to comply with the authority the parties have given him in the agreement. Assuming that the item is a proper subject of arbitration under the agreement, the arbitrator will reach the merits and render an award. If the losing party is unwilling to abide by the award, the prevailing party may seek to have the award confirmed by the Superior Court. *See N. J. S. A.* 2A:24-7; *Amal. Transit Wkrs. Local 140 v. Mercer Cty. Impr. Authority,* 76 *N. J.* 245 (1978).

Thus, PERC, the Superior Court and the arbitrator have distinct functions under our present scheme. To avoid need-

less procedural delays, we commend these guidelines to the bar.

## II

By way of preliminary observation, we note that PERC was correct in concluding that under the test set forth in *Dunellen Ed. Assn. v. Dunellen Bd. of Ed.,* 64 *N. J.* 17, 25 (1973) and *Englewood Bd. of Ed. v. Englewood Teachers Ass'n,* 64 *N. J.* 1, 7 (1973), and today reaffirmed in *State v. State Supervisory Employees Ass'n, supra,* 78 *N. J.* at 67, teacher transfers and reassignments are not mandatorily negotiable terms and conditions of employment. That test defined negotiable terms and conditions of employment as those matters which intimately and directly affect the work and welfare of public employees and on which negotiated agreement would not significantly interfere with the exercise of inherent management prerogatives pertaining to the determination of governmental policy. *State v. State Supervisory Employees Ass'n, supra,* 78 *N. J.* at 67. The selection of the school in which a teacher works or the grade and subjects which he teaches undoubtedly have an appreciable effect on his welfare. However, even assuming that this effect could be considered direct and intimate, we find that this aspect of the transfer decision is insignificant in comparison to its relationship to the Board's managerial duty to deploy personnel in the manner which it considers most likely to promote the overall goal of providing all students with a thorough and efficient education. Thus, we find that the issue of teacher transfers is one on which negotiated agreement would significantly interfere with a public employer's discharge of inherent managerial responsibilities. Accordingly, it is not a matter as to which collective negotiation is mandatory.

## III

To bolster its conclusion that *L.* 1974, *c.* 123 contemplated an expansion of negotiation into a permissive category of items, PERC makes several arguments. First, it points out that in passing *L.* 1974, *c.* 124, enacted on the same day as Chapter 123, which created a Public Employer-Employee Relations Study Commission, the Legislature implicitly assumed that there were already three categories of negotiating subjects.[1] That statute directs the Commission, *inter alia,* to study

Whether or not it is necessary and desirable either to define the phrase "terms and conditions of employment" as used in section 7 of the 1968 act [*N. J. S. A.* 34:13A–5.3] *and, in so doing, specify what subjects are mandatory, voluntary or illegal within the scope of bargaining or of grievance arbitration,* or to require that procedural guidelines be established for determining the same.

[*L.* 1974, *c.* 124, § 3(c) (emphasis added)]

We do not accord the great degree of significance to this legislative action that PERC does. The mandate of the Study Commission was not necessarily limited to examining the law as it existed. Moreover, it is abundantly clear that a proposal to study and suggest changes is not given the same close scrutiny by legislators as is one which has the force of law. Thus, even legislators vehemently opposed to permissive negotiation may have voted in favor of setting up the Study Commission. Finally, the Legislature was well aware of the fact that we had held in *Burlington Cty. Fac. Assoc. v. Bd. of Trustees, supra,* that no expansive view of negotiations would be implied from ambiguous legislation. We specifically required "clear and distinct phraseology" for a change of such magnitude.

---

[1] PERC has assumed that this was an aspect of its responsibility pursuant to *N. J. S. A.* 34:13A–5.4(d) and has provided by rule that each scope decision shall include a determination as to whether the disputed matter is a required, permissive or illegal subject for collective negotiation. *N. J. A. C.* 19:13–3.9.

■ PERC also alludes to *L. 1977, c. 85, N. J. S. A.* 34: 13A–14 to 21, which provides for compulsory and binding "interest" arbitration of impasses in contract negotiations between local, county and state governments and policemen and firemen. That statute expressly contemplates a permissive category of negotiation:

> Factfindings shall be limited to those issues that are within the required scope of negotiations unless the parties to the factfinding agree to factfinding on permissive subjects of negotiation.
>
> [*N. J. S. A.* 34:13A–16b]
>
> Arbitration shall be limited to those subjects that are within the required scope of collective negotiations, except that the parties may agree to submit to arbitration one or more permissive subjects of negotiation.
>
> [*N. J. S. A.* 34:13A–16f(4)]

Of course, this enactment is not now before us. Neither is it of great importance to our interpretation of *L. 1974, c.* 123. It represents a specific decision on the part of the Legislature to authorize permissive negotiations with respect to police and firemen. Moreover, if it were so clear that *L. 1974, c.* 123 had created such a permissive area, we doubt that the Legislature would have had to provide carefully for a permissive category in *L. 1977, c.* 85. This recent statute covering a small percentage of all public employees may not be accorded dispositive effect in interpreting a more general statute passed three years earlier. We intimate no view as to the validity of the authorization for binding arbitration of "permissive subjects of negotiation" in *N. J. S. A.* 34:13A–16f(4).

PERC also cites federal precedents under the Labor Management Relations Act, 29 *U. S. C.* § 141 *et seq.* Illustrative of these cases is *NLRB v. Wooster Div. of Borg-Warner Corp.*, 356 *U. S.* 342, 349, 78 *S. Ct.* 718, 2 *L. Ed.* 2d 823, 828 (1958), where the United States Supreme Court held that under 29 *U. S. C.* § 158(a)(5) and § 158(d), collective bargaining was mandatory only as to terms and conditions of employment. As to other matters, each party was

"free to bargain or not to bargain, and to agree to or not to agree." Of course, *Borg-Warner* dealt with the private sphere, and is therefore inapposite here.[2] In *Lullo v. Intern. Assoc. of Fire Fighters*, 55 *N. J.* 409, 436–441 (1970), we pointed out the significant differences between *N. J. S. A.* 34:13A–5.3 which grants a right to "collective negotiations" and 29 *U. S. C.* § 157 which grants a right to "collective bargaining."

> It is crystal clear that in using the term "collective negotiations" the Legislature intended to recognize inherent limitations on the bargaining power of public employer and employee.
>
> \* \* \* \* \* \* \* \*
>
> And undoubtedly they were conscious also that public agencies, departments, etc., cannot abdicate or bargain away their continuing legislative or executive obligations or discretion. Consequently, absent some further changes in pertinent statutes public employers may not be able to make binding contractual commitments relating to certain subjects.
>
> \* \* \* \* \* \* \* \*
>
> Finally, it signified an effort to make public employers and employees realize that the process of collective bargaining as understood in the private employment sector cannot be transplanted into the public service.
>
> [55 *N. J.* at 440]

Thus, federal precedents concerning the scope of collective bargaining in the private sector are of little value in determining the permissible scope of negotiability in public employment labor relations in New Jersey.

It is also contended that *N. J. S. A.* 34:13A–5.3, as amended by *L.* 1974, *c.* 123, § 4, see *ante* at 152, which man-

---

[2]In *Galloway Tp. Bd. of Ed. v. Galloway Tp. Ass'n of Ed. Secretaries*, 78 *N. J.* 1 (1978), we held that since the unfair practice provisions of *N. J. S. A.* 34:13A–5.4 closely parallel those of the Labor Management Relations Act, 29 *U. S. C.* § 158 and § 160, the federal precedents should guide our interpretation of the State act. However, this is not true with respect to scope of negotiability. We wish to specifically caution PERC and the Appellate Division of the limited relevance of private sector precedents with respect to scope-of-negotiations determinations.

dates that grievance procedures negotiated by the parties supersede any mechanisms for the resolution of disputes provided by any statute, indicates that a category of permissively negotiable matters is now contemplated by the Act. PERC placed particular emphasis on the fact that the Legislature used the words "disputes and controversies" in the amended version of *N. J. S. A.* 34:13A–5.3, since they are the very words found in *N. J. S. A.* 18A:6–9 which gives the Commissioner of Education jurisdiction to resolve disagreements arising under the education laws. PERC contends that *Dunellen, supra,* 64 *N. J.* at 30–31, relied upon these words in *N. J. S. A.* 18A:6–9 to distinguish those matters which could be arbitrated from those matters which could not. Thus, the 1974 amendment is viewed by PERC as modifying the narrow scope of arbitration permitted by the Act which we found in *Dunellen.*

▮ PERC errs in two respects. First, standing alone, *N. J. S. A.* 34:13A–5.3 is ineffective as a vehicle for expanding the permissible scope of arbitration. To be arbitrable, a matter must qualify as one on which the parties may negotiate. A matter which is not legally negotiable in the first place cannot be arbitrable. We have today held that the scope of grievability mandated by *N. J. S. A.* 34:13A–5.3 is limited to matters which affect the terms and conditions of public employment as that concept has been defined in our cases. *Tp. of West Windsor v. PERC,* 78 *N. J.* 98 (1978). Thus, only insofar as *N. J. S. A.* 34:13A–8.1 is viewed as increasing the legal scope of collective negotiation may *N. J. S. A.* 34:13A–5.3 be viewed as expanding the permissible coverage of contractual procedures for the resolution of grievances. Second, PERC and the Association both err in concluding that the *Dunellen* Trilogy was wholly based on statutory considerations. While our decisions in *Dunellen* and its companion cases were primarily based on the statutory language of *L.* 1968, *c.* 303 and the legislative intent underlying that enactment, we were not oblivious to more funda-

mental, constitutionally-rooted considerations of policy. As we observed in *Dunellen*:

> [*T*]*he Legislature,* in adopting the very general terms of *L.* 1968, *c.* 303, *did not contemplate that the local boards of education would or could* abdicate their management responsibilities for the local educational policies or that the State educational authorities would or could abdicate their management responsibilities for the State educational policies. *See Lullo v. Intern. Assoc. of Fire Fighters, supra,* 55 *N. J.* at 440; *Bd. of Ed., Tp. of Rockaway v. Rockaway Tp. Ed. Ass'n,* 120 *N. J. Super.* 564, 569 (1972); *cf. Porcelli v. Titus,* 108 *N. J. Super.* 301, 312 (1969), certif. denied, 55 *N. J.* 310 (1970).
>
> [64 *N. J.* at 25 (emphasis added)]

Moreover, full application of PERC's view that everything which in any way affects the terms and conditions of public employment is negotiable at the option of the parties, unless such negotiation on a given topic is precluded by a specific statute, would be inconsistent with a successor statute in the education area. The Legislature has determined that community involvement in educational decisions, insuring some democratic control over such matters, is a significant part of a thorough and efficient system of education in this state. In passing the Public School Education Act of 1975, *L.* 1975, *c.* 212, now codified as *N. J. S. A.* 18A:7A–1 *et seq.,* it gave that assumption the force of law:

(a) The Legislature finds and declares that:

\* \* \* \* \* \* \* \*

(5) In order to encourage citizen involvement in educational matters, New Jersey should provide for free public schools in a manner which guarantees and encourages local participation consistent with the goal of a thorough and efficient system serving all of the children of the State:

(6) A thorough and efficient system of education includes local school districts in which decisions pertaining to the hiring and dismissal of personnel, the curriculum of the schools, the establishment of district budgets, and other essentially local questions are made democratically with a maximum of citizen involvement and self-determination and are consistent with Statewide goals, guidelines and standards;

\* \* \* \* \* \* \* \*

[*N. J. S. A.* 18A:7A–2]

 Literal application of PERC's interpretation of *L.*
*1974, c. 123* would result in the emasculation of the intent
of this later act. There would be little room for community
involvement if agreements concerning educational policy
matters could be negotiated behind closed doors and disputes
concerning that agreement settled by an arbitrator who lacks
public accountability. We simply find insufficient evidence
of a legislative intent to permit this result to justify inter-
preting *N. J. S. A.* 34:13A–5.3 and 8.1 in the manner sug-
gested by PERC.

 Our holding herein is that *L.* 1974, *c.* 123 did not
clearly indicate a legislative intent to create a permissive
category of negotiations. Thus, we reaffirm our holding in
*Dunellen* that there are but two categories of subjects in
public employment negotiation — mandatorily negotiable
terms and conditions of employment and non-negotiable
matters of governmental policy. Since the subject of teacher
transfers is not within the scope of mandatory negotiability,
the Board acted in excess of its authority in agreeing to a
provision of its collective agreement with the Association
which would limit its managerial prerogatives on the
subject. Accordingly, the contractual provision purporting
to do so is invalid and may not be enforced against the
Board in any arbitration proceeding. While a policy such
as that expressed in the relevant contractual provision may
be a salutary one, adherence to that policy is not something
to which the Board could obligate itself in a collective
agreement providing for binding arbitration.

IV

We are hesitant to find the existence of a permissive
category of negotiable matters in public employment labor
relations to be implicit in the amended act because such a
classification might create serious problems in our democratic
system. These potential difficulties should be carefully con-
sidered by the Legislature before taking any action expressly

to authorize permissive negotiability with respect to all public employees. It is quite clear from our reading of the legislative history of *L.* 1974, *c.* 123 that the lawmakers did not purport to sanction the delegation of governmental policy decisions on every matter in any way touching upon the terms and conditions of public employment to the sphere of collective negotiation. We deem it appropriate for this Court to comment on these difficult questions concerning the permissibility of delegating governmental powers to private groups or of entrusting the formulation of governmental policy to an arena where the democratic voice of the electorate cannot be heard.

In *Tp. of West Windsor v. PERC,* 78 *N. J.* 98 (1978), we indicated that public employees' special access to government applies only where the government is acting in the capacity of an employer, and not where it is acting in its capacity as public policymaker. A private employer may bargain away as much or as little of its managerial control as it likes. *Tp. of West Windsor, supra.* However, the very foundation of representative democracy would be endangered if decisions on significant matters of governmental policy were left to the process of collective negotiation, where citizen participation is precluded. This Court would be most reluctant to sanction collective agreement on matters which are essentially managerial in nature, because the true managers are the people. Our democratic system demands that governmental bodies retain their accountability to the citizenry.

Our concern is with the very function of government. Both state and federal doctrines of substantive due process prohibit delegations of governmental policy-making power to private groups where a serious potential for self-serving action is created thereby. *Washington ex rel. Seattle Title Trust Co. v. Roberge,* 278 *U. S.* 116, 121–122, 49 *S. Ct.* 50, 73 *L. Ed.* 210 (1938) ; *Humane Soc. of U. S. v. N. J. State Fish and Game Comm.,* 70 *N. J.* 565, 578–579 (1976) ; *Group Health Insurance v. Howell,* 40 *N. J.* 436,

446–447 (1963), after remand 43 *N. J.* 104 (1964). *See also Ind. Elec. Ass'n of N. J. v. N. J. Bd. of Exam.,* 54 *N. J.* 466, 482–483 (1969). To be constitutionally sustainable, a delegation must be narrowly limited, reasonable, and surrounded with stringent safeguards to protect against the possibility of arbitrary or self-serving action detrimental to third parties or the public good generally. *Amal. Transit Wkrs. Local 140 v. Mercer Cty. Impr. Authority, supra;* *Group Health Insurance v. Howell, supra,* 40 *N. J.* at 445; *N. J. Dept. of Trans. v. Brzoska,* 139 *N. J. Super.* 510, 513 (App. Div. 1976).

In *Howell* this Court twice invalidated a statute which had the effect of requiring prior approval by the New Jersey Medical Society of any medical services corporation before it could be licensed by the Commissioner of Insurance. Not only was there a delegation of governmental policy-making power to private persons, but it was fraught with the opportunity of self-serving action since the only existing medical services corporations, Blue Cross and Blue Shield, had been organized by the Medical Society itself and were substantially under its control.

We think that such a power to restrict, or indeed, to prohibit, competition in a field so vitally connected with the public welfare may not constitutionally be placed in the hands of a private organization such as the Medical Society, which has an interest in promoting the welfare of the only existing medical service corporation in this State. Such delegation by the Legislature of its licensing power violates *N. J. Const.* 1947, *Art.* IV, § 1, *par.* 1, which provides: "The legislative power shall be vested in a Senate and General Assembly."
[40 *N. J.* at 447 (citation omitted)]
The relationship of section 2 and section 3 in the statutory scheme and in practical effect is too close to be overlooked. When read together they show clearly an attempt to delegate to private persons the power to decide whether a particular medical service corporation shall be authorized to transact business in any county. The delegation does not relate to competency of medical services to be rendered or to standards of medical performance. Rather, it is in effect a grant of power to approve or disapprove the services and fees which willing physicians and willing subscribers wish to agree to.

For the above reasons we conclude that the challenged part of section 3 of the Medical Service Corporations Law (*N. J. S. A.* 17:48A–3) violates *Art.* I, *par.* 1, and *Art.* IV, § 1, *par.* 1 of the New Jersey *Constitution* of 1947 and the Fourteenth Amendment of the Federal *Constitution.*

[43 *N. J.* at 113]

Since teachers possess substantial expertise in the education area, negotiations between teachers' associations and boards of education present a situation where an agreement which effectively determines governmental policy on various issues is especially likely. The impropriety of permitting such educational policy matters to be determined in the forum of collective negotiation — just as if they pertained to the terms and conditions of employment — is every bit as strong as it is in other areas of public employment. The interests of teachers do not always coincide with the interests of the students on many important matters of educational policy. Teachers' associations, like any employee organizations, have as their primary responsibility the advancement of the interests of their members. Arbitrators, to whom the resolution of grievances under collective agreements is generally entrusted, are concerned primarily with contractual rights and remedies. Of the relevant actors at the local level, only school boards have a primary responsibility to the public at large, as they have been delegated the responsibility of ensuring that all children receive a thorough and efficient education. These boards are responsible to the local electorate, as well as to the State, and may not make difficult educational policy decisions in a forum from which the public is excluded. Moreover, a multi-year contract covering policy matters would freeze the *status quo* and prevent a school board from making a flexible, creative response to changed circumstances, which might well preclude its acting in the best interests of the students.

The Legislature is of course free to exercise its judgment in determining whether or not a permissive category of negotiation is sound policy. We wish merely to point out that careful consideration of the limits which our democratic

system places on delegation of government powers is called for before any such action is taken.[3] On the other hand, we are in no way prejudging the constitutionality of the concept of permissive negotiation *per se*.

We hold that the enactment of *L*. 1974, *c*. 123, §§ 4 and 6, *N. J. S. A.* 34:13A–5.3 and 8.1, did not have the effect of creating a new category of negotiating subjects in public employment labor relations comprised of matters negotiable at the option of the parties even though primarily concerned with governmental policy. PERC's scope-of-negotiations determination requiring that the Ridgefield Park Board of Education submit the propriety of teacher transfers and reassignments to binding arbitration is disapproved. In view of the foregoing, the Chancery Division order that the parties proceed to arbitration is reversed and arbitration is permanently enjoined.

CONFORD, P. J. A. D. (temporarily assigned), concurring and dissenting. I concur in the Court's judgment in this case that arbitration be permanently enjoined. But I do not reach that conclusion by the Court's rationale — *i.e.*, that there is no legal category of permissively negotiable items

---

[3]As Professor Clyde W. Summers aptly puts it:

One consequence of public employee bargaining is at least partial preclusion of public discussion of those subjects being bargained. And the effect of an agreement is to foreclose any change in matters agreed upon during the term of the agreement. Because it *constitutes something of a derogation from traditional democratic* principles, collective bargaining should be limited to those areas in which public employees do indeed encounter massed resistance. In other areas, disputes by public employees should be resolved through the customary channels of political decisionmaking.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

The private employer's prerogatives are his to share as he sees fit, but the citizen's right to participate in governmental decisions cannot be bargained away by any public official.

["Public Employee Bargaining: A Political Perspective," 83 *Yale L. J.* 1156, 1192–1193 (1974) (footnotes omitted)]

in public employment relations but only the mandatorily negotiable category of "terms and conditions" of employment. I agree with the Public Employment Relations Commission (PERC) that the Legislature has by *L.* 1974, *c.* 123 and *L.* 1977, *c.* 85 manifested its recognition of a class of permissive as well as of mandatory items for labor negotiation and with PERC's implementation by regulations of that understanding in the exercise of its scope-of-negotiations jurisdiction under *L.* 1974, *c.* 123 (*N. J. S. A.* 34:13A–5.4d.).

Practical recognition of negotiations in the permissive area has become a fact of life in the course of actual negotiations of collective agreements throughout the State in recent years and the validity thereof has been adjudicated in several leading jurisdictions beyond our borders. Today's holding by the Court is therefore a backward step in the heretofore progressive development of public sector labor law in this State which will not conduce toward the legislative policy of promoting peace and stability in public employment relations.

However, I enter one qualification to my agreement with PERC's view as to this matter, and this will explain my concurrence in the Court's injunction against arbitration of the dispute in this case. Although, for reasons I shall presently set forth, a public employer may at its option choose to negotiate a permissive item, *i.e.,* one which involves inherent managerial policy but also impacts appreciably upon the welfare of employees, it may not agree to binding arbitration of a dispute with respect to a negotiated item if so doing would transfer the making of an inherent managerial decision from a governmental official to an arbitrator.[1] Such a transfer would occur here if the contractual stipulation

---

[1] I would hold this view at least in the absence of an express legislative provision to the contrary such as that enacted by *L.* 1977, *c.* 85 which permits public employers of police and firemen to agree to binding arbitration of disputed subjects of permissive negotiation. *N. J. S. A.* 34:13A–16f. (4).

for binding arbitration of the employees' complaints with respect to transfers of teaching assignments were enforced. · There can be no doubt that the determination as to where in a school system a particular teacher can best serve is a matter of inherent managerial policy; and this whether N. J. S. A. 18A:25-1 is regarded as procedural or substantive.[2] Therefore, although the contract provisions provided for notice to affected employees of involuntary transfers and for acceding to wishes of employees for transfers if not in "conflict with the instructional requirements and best interests of the school system," and although I believe it was proper for the school board to negotiate these provisions with the union, there was no clear statutory authority for surrender by the school board to an arbitrator of the decision as to whether a transfer or refusal to transfer a teacher conflicted with instructional requirements or the best interests of the school system. In my judgment nothing less than explicit legislative authorization could warrant a court in holding an agreement for binding arbitration with such effect upon governmental decision-making to be valid.

It may possibly be that my position in this matter is not fundamentally different from that of PERC. The *amicus* brief of PERC in a related appeal before this Court (*Englewood Teachers Association v. Englewood Board of Education*, A-137 Sept. Term 1977) concedes that its position is subject to the condition that the agreement of an employer to arbitrate with respect to a permissive area of negotiations does not "violate the prohibitions of other statutes or public policy." It appears clear to me that the bargaining away by a public employer of its duty of ultimate determination of a matter of inherent managerial policy, as in the present case, is contrary to public policy. However it may be that PERC does not share my view of public policy in this re-

---

[2]This statute provides that "[n]o teaching staff member shall be transferred except by a recorded roll call majority vote of the full membership of the board of education by which he is employed."

gard in the light of its having upheld agreements to arbitrate the merits of matters of managerial discretion in relation to a number of contracts covering permissive areas of negotiation. See, *e. g., In re Bridgewater-Raritan Regl. Board of Education,* P. E. R. C. No. 77–21, October 26, 1976.

In any event, any difference of opinion I may have with PERC in the latter regard does not extend to its endorsement, not only in the *Bridgewater-Raritan* case, *supra,* but in a number of others decided by it within the last two years, of the principle of permissive negotiation of matters beyond the technical confines of "terms and conditions of employment" laid down in *Dunellen Bd. of Ed. v. Dunellen Ed. Ass'n,* 64 *N. J.* 17 (1973). That case held, in relation to school employers, that matters predominantly of educational policy with only remote or incidental effect on terms and conditions of employment were neither negotiable nor arbitrable. *Id.* at 29, 31. Even as to those matters which "intimately and directly affect the work and welfare of [the] employees," negotiation would be required only if possible "without any significant interference with management's educational responsibilities." *Id.* at 25. No recognition was accorded a possible category of permissive subjects of negotiation except for a hortatory expression of encouragement for employers voluntarily to discuss with teachers "fields with which the teachers are significantly concerned though outside the fields of mandatory negotiation." *Id.* at 32.

*Dunellen* was influenced by two factors which were neutralized in the subsequent 1974 amendment of the act. These were (1) the previous statutory provision that the act should not " 'annul or modify any statute * * * of this State' " and (2) provisions in Title 18 of the Revised Statutes, dealing with education, for the Commissioner of Education to hear all controversies and disputes "arising under the school laws." See 64 *N. J.* 28–29 and 30. PERC has, and I think soundly, ascribed considerable significance to the changes effected in both of these respects by the 1974 amendments. As to the first factor, the statute was altered merely to prohibit any

annulment or modification by the act of "any pension statute" of this State. *N. J. S. A.* 34:13A-8.1. In respect of the second factor, an amendment of *N. J. S. A.* 34:13A-5.3 declared that grievance procedures established by agreement of the parties should be utilized notwithstanding any procedures for the resolution of disputes, controversies or grievances established by any other statute (an obvious allusion to the jurisdiction of the Commissioner of Education over school controversies).

It seems universally conceded that these amendments were aimed at the restrictive holding in the *Dunellen* case as to the scope of valid employment negotiations although there is wide disagreement as to the precise effect which should be accorded the amendments. Insofar as concerns the specific question now before us, *i. e.*, an intent to broaden the area of valid negotiations to a permissive category not contemplated by *Dunellen*, the PERC thesis is strongly supported by the text of a provision incorporated into the 1974 amendment for the creation of a Study Commission to study the implementation and effectiveness of the act and propose any additional changes necessary. One of the specific questions the Commission was asked to address was:

> Whether or not it is necessary and desirable either to define the phrase "terms and conditions of employment" as used in section 7 of the 1968 act (C. 34:13A-5.3) *and, in so doing, specify what subjects are mandatory, voluntary or illegal within the scope of bargaining or of grievance arbitration*, or to require that procedural guidelines be established for determining the same. Section 3(e), *Chapter 124, P. L.* 1974. (emphasis added)

The phrasing of the question indicates that the Legislature took it for granted that in actual practice scope of negotiations was already divided into three categories, including a "voluntary" (*i. e.*, permissive) one.

Additional significant indication of current legislative cognizance of a permissive category of negotiations is afforded by the 1977 statute for binding arbitration of collective nego-

tiation disputes concerning police and firemen. *L.* 1977, *c.* 85. See note 1, *supra.* This specifically classifies negotiations as between "required" and "permissive" without otherwise defining those terms. In view of the fact that well prior to the adoption of the 1977 police and firemen's statute PERC had begun to implement by decision and regulation the concept of permissive as distinguished from mandatory or required categories of negotiation, see *N. J. A. C.* 19:13–3.7, the use of those categories in the 1977 act is additional cogent indication of legislative approval of the concept. Moreover, we ought to attribute substantial weight to the interpretation and practical administration of the employment relations act by PERC as the responsible and expert administrative agency empowered by the act to determine scope of negotiations questions. *In re Application of Saddle River,* 71 *N. J.* 14, 21 (1976) ; *The Passaic Daily News v. Blair,* 63 *N. J.* 474, 484 (1973).

The approach of PERC to the question under discussion has been mirrored by that of a number of courts in other states. See *Bd. of Ed. etc. v. Yonkers Fed. of Teachers,* 40 *N. J.* 2d 268, 386 *N. Y. S.* 2d 657, 353 *N. E.* 2d 569 (1976) ; *Sch. Comm. of Boston v. Boston Tchrs. U., etc.,* 363 *N. E.* 2d 485 (Sup. Jud. Ct. Mass. 1977) ; *Springfield Ed. Ass'n v. Springfield Sch. Dist. No. 19,* 25 Or. App. 407, 549 *P.* 2d 1141 (Ct. App. 1976) ; *Scranton Sch. Bd. v. Scranton Fed. of Teachers,* 27 *Pa. Cmwlth.* 152, 365 *A.* 2d 1339 (Cmwlth. Ct. 1976). While some of these cases go beyond my view in that they approve binding arbitration of matters of inherent managerial discretion, nevertheless to the extent that they recognize the concept of a permissive as distinguished from a mandatory or required category of negotiations in the public employment field, they represent the recent preponderant and enlightened judicial trend toward a more flexible range of negotiating discretion by public employers — one which seems necessary to achieve the goal of peace and stability in public employment relations set forth in the employment relations act as first adopted.

*N. J. S. A.* 34:13A-2. See also Edwards, "The Emerging Duty to Bargain in the Public Sector," 71 *Mich. L. Rev.* 885, 909 (1973) ("State courts and public employment relations boards have likewise frequently relied upon the mandatory-permissive-illegal distinction"); Clark, "The Scope of the Duty to Bargain Public Employment," in Knapp "Labor Relations Law in the Public Sector," at p. 83–84 (1977).

I regard it as unfortunate that by its decision in this case rejecting permissive negotiability the Court dismisses the now widely accepted approach and in effect undoes the salutary course of *quasi*-judicial and administrative progress being achieved by PERC and deprives it, as well as public employers generally, of a most useful tool in this vital area of the public weal.

The fears expressed by the Court concerning delegation of public policy decisions to the process of collective negotiation "where voter participation is excluded" (p. 163) do not seem to me realistic. Voters also do not participate where the public employer negotiates wages and hours of employment. In a sense, even decisions as to such matters by public employers are exercises of public policy decision-making. Thus it is obvious that legislation for promoting public sector labor relations contemplates very substantial inroads into what was once untrammeled unilateral determination of the circumstances of employment by public employers. It would be artificial and counterproductive of legislative goals in this area to continue absolutely to prohibit the process of negotiation on subjects which appreciably impact upon the welfare of employees merely because the subject matter of agreement also involves managerial or educational judgment and discretion. The public interest is fully protected by the condition recognized by PERC that the agreement not contravene any contrary specific statutory mandate and by my qualification that binding arbitration not be permitted if the arbitrator's decision would supplant an exercise of inherent managerial judgment and discretion by the employee.

In summary, the negotiation of the subject of transfer of teacher assignments in the instant contract was valid; the provision for binding arbitration of disputes over whether a particular teacher should or should not be transferred was invalid.

*For reversal*—Chief Justice HUGHES and Justices SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER and HANDLER—6.

*Concurring and dissenting*—Judge CONFORD—1.