634 A.2d 478

STATE OF NEW JERSEY, PETITIONER–APPELLANT,
v. STATE TROOPERS FRATERNAL ASSOCIATION,
RESPONDENT–RESPONDENT.

Argued September 14, 1993—Decided December 20, 1993.

394

*Mary L. Cupo–Cruz,* Senior Deputy Attorney General, argued the cause for appellant (*Fred DeVesa,* Acting Attorney General of New Jersey, attorney; *Alexander P. Waugh, Jr.,* Assistant Attorney General, of counsel).

*Michael J. Rappa* argued the cause for respondent State Troopers Fraternal Association (*Loccke & Correia,* attorneys).

*Robert E. Anderson,* General Counsel, argued the cause for Public Employment Relations Commission.

The opinion of the Court was delivered by

STEIN, J.

The issue presented by this appeal is whether the so-called "discipline amendment" to *N.J.S.A.* 34:13A–5.3, *L.* 1982, *c.* 103, obligates the New Jersey Division of State Police (State Police or Division) to engage in collective negotiations concerning procedures, including binding arbitration, to review disciplinary determinations affecting state troopers.

A somewhat different issue precipitated the litigation. The basic dispute between the State Troopers Fraternal Association (STFA) and the State Police was whether certain grievances were arbitrable under their existing negotiated agreement. Four state troopers had filed the grievances to challenge the legality of the State Police's use of summary disciplinary hearings to resolve disciplinary violations allegedly committed by those troopers and to determine appropriate sanctions. Contending that the conduct implicated by the alleged violations was not sufficiently serious to warrant disciplinary hearings and customarily had been regarded by the State Police as warranting only written reprimands, the troopers asserted that the use of summary disciplinary hearings to resolve the various infractions was inconsistent with the underlying agreement. The State Police Superintendent rejected the grievances on the ground that they were not authorized by the agreement. The STFA then sought to invoke the binding arbitration mechanism in the agreement to resolve the grievances. The

State objected, asserting that the underlying issue was not arbitrable, and informing the designated arbitrator that the State did not intend to arbitrate.

To avoid the arbitration that the STFA had initiated, the State petitioned the Public Employment Relations Commission (PERC) for a scope-of-negotiations determination pursuant to *N.J.S.A.* 34:13A–5.4(d) of the New Jersey Employer–Employee Relations Act, *N.J.S.A.* 34:13A–1 to –29 (the Act). The question posed by the State's petition was whether discipline imposed by the Superintendent of State Police is within the scope of collective negotiations. The State contended that such negotiations were preempted by the broad grant of authority conferred on the State Police Superintendent by *N.J.S.A.* 53:1–10, which provides:

> The superintendent shall, with the approval of the governor, make all rules and regulations for the discipline and control of the state police, and provide the necessary preliminary and subsequent instruction to the troopers in their duties as police officers.

Relying on the 1982 discipline amendment to *N.J.S.A.* 34:13A–5.3, PERC held that that amendment obligated the State Police to negotiate concerning procedures to review disciplinary determinations, including binding arbitration, notwithstanding the Superintendent's statutory supervisory authority over rules and regulations for discipline of the state troopers. *In re State of New Jersey & State Troopers Fraternal Ass'n,* 17 *NJPER* (Lab. Rel. Press) ¶ 22152 (PERC June 21, 1991). PERC expressly refrained, however, from deciding whether the underlying grievances were arbitrable under the existing agreement, and if arbitrable, meritorious, emphasizing that PERC's function was to address only the abstract issue of whether the subject matter in dispute is within the scope of collective negotiations. *Id.* ¶ 22152, at 341. Ironically, the underlying dispute concerning the arbitrability of the grievances under the agreement, which triggered the litigation, has never been resolved and is now moot. Three of the troopers have withdrawn their grievances and the Division has dismissed disciplinary charges against the fourth.

The Appellate Division affirmed PERC's scope-of-negotiations ruling, 260 *N.J.Super.* 270, 615 *A.*2d 1286 (1992), observing that "[t]he discipline amendment and its arbitration provisions presumptively apply to all employers and employees covered by the Act." *Id.* at 280, 615 *A.*2d 1286. Accordingly, that court concluded that PERC's interpretation of the discipline amendment "preserves the employee's right to negotiate over minor disciplinary proceedings without diluting the employer's authority under *N.J.S.A.* 53:1–10 to adopt rules governing employee conduct." *Id.* at 282, 615 *A.*2d 1286.

We granted the State's Petition for Certification, 133 *N.J.* 435, 627 *A.*2d 1141 (1993). Although the grievances that precipitated this litigation have been resolved, we consider and decide the issue presented by this appeal because of its public importance. *See Clark v. Degnan*, 83 *N.J.* 393, 397, 416 *A.*2d 816 (1980).

## I

The underlying controversy between the parties will provide a context for our resolution of this appeal. The relevant labor agreement was in effect from July 1, 1987, to June 30, 1990, and Article XII of that agreement established the policy and procedures for the submission and settlement of grievances filed by state troopers. The grievance provisions of the agreement refer to the three categories of disciplinary proceedings described in the State Police Rules and Regulations:

(1) A general disciplinary hearing, which can result in reduction in rank or grade, suspension with forfeiture of pay, or removal;

(2) A summary disciplinary hearing, which can result in suspension and forfeiture of pay for up to one month; and

(3) A written reprimand, for infractions that the Superintendent determines are not sufficiently serious to warrant a disciplinary hearing, pursuant to which the offending trooper may be suspended with forfeiture of pay for up to five days.

*New Jersey State Police Rules and Regulations* art. I, § 1(a)–(c) (Aug. 1977) (*Rules and Regulations*).

The grievance provisions of the state troopers' labor agreement specified that the grievance procedures did not apply to discipline

resulting from general or summary disciplinary hearings. Although the grievance provisions did encompass discipline resulting from written reprimands, that grievance procedure was truncated in that the agreement stated that those grievances were to be submitted directly to the State Police Superintendent, and if not resolved by the Superintendent, to the Attorney General for final resolution.

The agreement distinguished between two kinds of grievances: (1) an allegation of a breach, misinterpretation, or improper application of the provisions of the agreement (a "B-1 grievance"); and (2) a claimed violation, misinterpretation, or misapplication of the rules and regulations, policy, or procedures affecting the terms and conditions of employment (a "B-2 grievance"). The agreement provided that if B-2 grievances could not be resolved pursuant to an intra-departmental grievance procedure described in the agreement, such grievances could be submitted to the Attorney General for final resolution. If B-1 grievances could not be resolved intra-departmentally, those grievances could be submitted for resolution by binding arbitration.

The troopers' grievances focused on the use of summary disciplinary hearings as the mechanism to impose discipline for infractions that the troopers characterized as "minor." Trooper John Christmann, charged with failing to carry his weapon while on duty, was suspended without pay for four days. Trooper Hiram Ortiz, Jr. was charged with disobeying a written order concerning the approved method of searching female suspects, speaking abusively to a female suspect, and failing to search a van in which he had probable cause to believe marijuana was concealed; Ortiz was suspended without pay for eight days. Trooper Michael Karsevar, charged with losing or allowing the theft of his weapon, received a four-day suspension without pay. The fourth trooper had been charged with losing a portable radio and ordered to appear at a summary disciplinary hearing, but the hearing was cancelled after the charge was dismissed.

Although the existing agreement expressly provided that the grievance procedures did not apply to discipline imposed at general or summary disciplinary hearings, the troopers filed B–1 grievances alleging that the State Police's designation of the summary disciplinary hearing procedure constituted a "circumvention" of the agreement. The troopers asserted that the disciplinary violations of which they had been accused customarily had been resolved pursuant to the written-reprimand disciplinary procedure. However, no provision of the agreement defined the type of disciplinary infractions warranting only written reprimands rather than summary or general disciplinary hearings; the State Police Rules and Regulations remit such a determination to the Superintendent's discretion. *Rules and Regulations* art. I, § 1(c). Nevertheless, after the grievances had been rejected by the Superintendent, the STFA sought relief through the binding arbitration procedure available under the agreement for B–1 grievances. The State then filed its scope-of-negotiations petition with PERC to restrain the arbitration and to elicit a determination about whether the Division is obligated to engage in collective negotiations concerning review procedures and arbitration of state trooper disciplinary proceedings.

Before addressing the merits, we note that the core issue of contractual arbitrability raised by the STFA's request for arbitration was far easier to resolve than the question presented by the scope-of-negotiations petition to PERC. We acknowledge the dictum in *Ridgefield Park Education Ass'n v. Ridgefield Park Board of Education*, 78 *N.J.* 144, 393 *A.*2d 278 (1978), stating that resolution of the scope-of-negotiations issue should precede resolution of the question of contractual arbitrability:

> We agree with PERC that contract interpretation is a question for judicial resolution. Thus, where a party resists an attempt to have a dispute arbitrated, it may go to the Superior Court for a ruling on the issue of its contractual obligation to arbitrate. However, the issue of contractual arbitrability may not be reached if the threshold issue of whether the subject matter of the grievance is within the scope of collective negotiations is contested. In that event, a ruling on that issue must be obtained from PERC. Thus, the preferable procedure in the instant case

would have been for PERC to have rendered its scope determination before the issue of contractual arbitrability was addressed.

[*Id.* at 155, 393 *A.*2d 278.]

Nevertheless, the procedure described in *Ridgefield Park, supra,* is best understood as a recommended, but not exclusive, mechanism for obtaining an orderly resolution of interrelated issues, one primarily administrative and the other contractual. Where, as here, the contractual arbitrability issue is so much more limited than the negotiability question, the more efficient and pragmatic procedure would be for the party resisting arbitration to seek a judicial determination of the arbitrability question, reserving the right to resort to a scope-of-negotiations proceeding before PERC in the event of an adverse ruling. At oral argument counsel for PERC acknowledged that resolution of the issue of arbitrability prior to submission of a scope-of-negotiations petition to PERC may often be preferable to the procedure used in this case.

II

In resolving the question whether discipline imposed by the Superintendent of State Police is within the scope of collective negotiations, both PERC and the Appellate Division considered the issue to be governed by the literal language of the discipline amendment, *L.* 1982, *c.* 103, which revised the final paragraph of *N.J.S.A.* 34:13A–5.3 to read as follows:

Public employers shall negotiate written policies setting forth grievance and disciplinary review procedures by means of which their employees or representatives of employees may appeal the interpretation, application or violation of policies, agreements, and administrative decisions, including disciplinary determinations, affecting them, provided that such grievance and disciplinary review procedures shall be included in any agreement entered into between the public employer and the representative organization. Such grievance and disciplinary review procedures may provide for binding arbitration as a means for resolving disputes. The procedures agreed to by the parties may not replace or be inconsistent with any alternate statutory appeal procedure nor may they provide for binding arbitration of disputes involving the discipline of employees with statutory protection under tenure or civil service laws. Grievance and disciplinary review procedures established by agreement between the public employer and the

representative organization shall be utilized for any dispute covered by the terms of such agreement.

Neither PERC nor the Appellate Division approached the issue in the context of our basic guidelines for determining the negotiability of terms and conditions of employment between public employers and employees. The guidelines balance the managerial interests of the public employer and the bargaining interests of the public employees to ascertain whether collective negotiations about the matter in issue would significantly interfere with the public employer's responsibility to determine governmental policy. *In re IFPTE Local 195 v. State,* 88 *N.J.* 393, 404–05, 443 *A.*2d 187 (1982).

We acknowledge that the literal provisions of the discipline amendment apply to the State Police as well as to other public employers, and that we review with appropriate deference PERC's determinations implementing the provisions of the Act. *In re Hunterdon County Bd. of Chosen Freeholders,* 116 *N.J.* 322, 328, 561 *A.*2d 597 (1989). Nevertheless, the principle that "statutes are to be read sensibly rather than literally," *Schierstead v. Brigantine,* 29 *N.J.* 220, 230, 148 *A.*2d 591 (1959), warrants a measured review of the decisional law leading to the adoption of the discipline amendment to verify that PERC and the Appellate Division have perceived accurately the Legislature's purpose.

As originally enacted, the New Jersey Employer–Employee Relations Act mandated that public employers negotiate in good faith with the majority representative of public employees "with respect to grievances and terms and conditions of employment." *L.* 1968, *c.* 303, § 7. The Legislature, however, left undefined the phrase "terms and conditions of employment" and left unspecified "what subjects were negotiable and what subjects were outside the sphere of negotiation." *Dunellen Bd. of Educ. v. Dunellen Educ. Ass'n,* 64 *N.J.* 17, 24, 311 *A.*2d 737 (1973). Our 1973 decisions in the so-called *"Dunellen* trilogy" established the need to determine on a case-by-case basis the subjects that are mandatorily negotiable under the Act, as distinguished from matters of governmental policy exclusively within the prerogative of manage-

ment. *Dunellen, supra,* 64 *N.J.* at 30–31, 311 *A.*2d 737 (holding that consolidation of high school social studies and English departments not proper subject of mandatory negotiation or arbitration); *Burlington County College Faculty Ass'n v. Board of Trustees,* 64 *N.J.* 10, 16, 311 *A.*2d 733 (1973) (holding that formulation of college calendar fixing length and division of college year was managerial prerogative and not proper subject of mandatory negotiation); *Board of Educ. v. Englewood Teachers Ass'n,* 64 *N.J.* 1, 7, 311 *A.*2d 729 (1973) (holding that working hours and compensation of special education teachers are "terms and conditions of employment" and thus suitable for negotiation and grievance procedures). We also took note of the limitation set forth in *N.J.S.A.* 34:13A–8.1 specifying that no provision of the Act could "annul or modify any statute or statutes of this State." We observed in *Dunellen* that that strong qualifying language "clearly precluded any expansive approach" to the negotiability of terms and conditions of public employment, 64 *N.J.* at 31, 311 *A.*2d 737, especially where the subject sought to be negotiated was encompassed by existing legislation. *Id.* at 28–29, 311 *A.*2d 737.

Dissatisfaction with the *Dunellen* limitations on negotiability prompted the Legislature to amend the Act in 1974. *L.* 1974, *c.* 123. *See State v. State Supervisory Employees Ass'n,* 78 *N.J.* 54, 67, 393 *A.*2d 233 (1978). The most significant change was an amendment to *N.J.S.A.* 34:13A–8.1. Prior to the amendment that section ended with the phrase "nor shall any provision hereof annul or modify any statute or statutes of this State," the language we relied on in *Dunellen* to preclude negotiability under the Act of subjects within the purview of existing legislation. 64 *N.J.* at 28–29, 311 *A.*2d 729. The 1974 amendment revised that portion of *N.J.S.A.* 34:13A–8.1 to read: "[N]or shall any provision hereof annul or modify any *pension* statute or statutes of this State." *L.* 1974, *c.* 123, § 6 (emphasis added). In *State Supervisory,* we rejected both the State's contention that the amendment had no effect on the scope of negotiations under the Act and the union's contention that the legislative purpose was to mandate negotiation over all subjects *except* for matters covered by pension statutes.

Rather, we adopted PERC's interpretation of the 1974 amendment, which would have precluded negotiation concerning matters beyond the statutory authority of the public employer and would not have permitted public employers to agree to terms that would violate a statutory imperative. 78 *N.J.* at 79–80, 393 *A.*2d 233. Nevertheless, we modified our holding in *Dunellen* by recognizing that under the 1974 amendment a general statutory enactment would no longer preclude mandatory negotiations over terms and conditions of employment that could have been, but were not yet, the subject of regulation. *Id.* at 80–81, 393 *A.*2d 233. Under the amendment,

[s]tatutes or regulations concerning terms and conditions of public employment which do not speak in the imperative, but rather permit a public employer to exercise a certain measure of discretion, have only a limited preemptive effect on collective negotiation and agreement.

[*Id.* at 81, 393 *A.*2d 233.]

We also gave express recognition to the 1974 amendment of *N.J.S.A.* 34:13A–5.3, *L.* 1974, *c.* 123, § 4, providing that statutory dispute-resolution mechanisms to resolve employee complaints would be superseded by grievance procedures negotiated by the public employer and the employee representative. *State Supervisory, supra,* 78 *N.J.* at 68, 80 n. 6, 393 *A.*2d 233.

In *Ridgefield Park Education Ass'n, supra,* 78 *N.J.* 144, 393 *A.*2d 278, decided the same day as *State Supervisory,* we reversed PERC's holding that the 1974 amendments to the Act created a class of permissively-negotiable matters that although not mandatorily negotiable were nevertheless negotiable voluntarily by public employees. The majority representative had sought arbitration of grievances on behalf of teachers who "were involuntarily reassigned to teach courses or grades * * * they did not wish to teach, were refused a desired transfer to a different school, or were involuntarily transferred to another school." *Id.* at 150–51, 393 *A.*2d 278. PERC had concluded that teacher transfers and reassignments were not mandatorily negotiable because of the potential interference with the public employer's inherent managerial responsibilities, but nevertheless determined that the 1974 amend-

ment contemplated a permissive category of negotiable subjects. Unable to find sufficient evidence of legislative intent to sustain PERC's determination, we concluded

that *L.* 1974, *c.* 123 did not clearly indicate a legislative intent to create a permissive category of negotiations. Thus, we reaffirm our holding in *Dunellen* that there are but two categories of subjects in public employment negotiation—mandatorily negotiable terms and conditions of employment and non-negotiable matters of governmental policy.

[*Id.* at 162, 393 *A.*2d 278.]

We were again confronted with the conflict between managerial prerogatives and their effect on terms and conditions of employment in *Board of Education v. Woodstown–Pilesgrove Regional Education Ass'n,* 81 *N.J.* 582, 410 *A.*2d 1131 (1980). There, the teachers' bargaining representative had invoked the grievance-arbitration provisions of the negotiated labor agreement in respect of the Board's determination to extend by two hours, without compensation, the length of the school day on the day before Thanksgiving. The Board asserted that an increase in working hours was a managerial prerogative not subject to negotiation, and the teachers' representative countered that the increase in hours without compensation affected directly the terms and conditions of employment and was therefore mandatorily negotiable. Concluding that negotiation over the increase in hours and its compensability would not "substantially encroach" on the management prerogatives of the Board, *id.* at 593, 410 *A.*2d 1131, we recognized the need for a careful evaluation of the competing interests:

The nature of the terms and conditions of employment must be considered in relation to the extent of their interference with managerial prerogatives. A weighing or balancing must be made. When the dominant issue is an educational goal, there is no obligation to negotiate and subject the matter, including its impact, to binding arbitration. * * *

On the other hand, a viable bargaining process in the public sector has also been recognized by the Legislature in order to produce stability and further the public interest in efficiency in public employment. * * * Where the condition of employment is significantly tied to the relationship of the annual rate of pay to the number of days worked, then negotiation would be proper even though the cost may have a significant effect on a managerial decision to keep the schools open more than 180 days.

[*Id.* at 591, 410 *A.*2d 1131.]

■ We further refined our guidelines for determining mandatory negotiability in *In re IFPTE Local 195 v. State, supra,* 88 *N.J.* 393, 443 *A.*2d 187, in which the public employer and the bargaining representative presented opposing views about the negotiability of subcontracting, length of work week, and transfer and reassignment determinations. We held that the substantive decision concerning contracting-out work was a non-negotiable managerial prerogative; that the length of the employees' work week was negotiable; and that although the procedural aspects of transfer and reassignment were mandatorily negotiable, the substantive criteria were not. *Id.* at 419–20, 443 *A.*2d 187. In reaching those conclusions, we promulgated a three-part test for determining negotiability of issues between public employers and public employees:

[A] subject is negotiable between public employers and employees when (1) the item intimately and directly affects the work and welfare of public employees; (2) the subject has not been fully or partially preempted by statute or regulation; and (3) a negotiated agreement would not significantly interfere with the determination of governmental policy. To decide whether a negotiated agreement would significantly interfere with the determination of governmental policy, it is necessary to balance the interests of the public employees and the public employer. When the dominant concern is the government's managerial prerogative to determine policy, a subject may not be included in collective negotiations even though it may intimately affect employees' working conditions.

[*Id.* at 404–05, 443 *A.*2d 187.]

In the course of the evolution of this Court's jurisprudence concerning those subjects that are mandatorily negotiable under the Act, we had not specifically considered prior to the adoption of the discipline amendment whether grievance procedures, including binding arbitration, to review public-employer disciplinary determinations constituted a subject for mandatory negotiations. That issue had been addressed by both PERC and the Appellate Division, and their determinations inform our understanding of the intended scope of the discipline amendment. See *infra* at 408–411, 634 *A.*2d at 487–488. We have had occasion, however, to review a PERC scope-of-negotiations determination that, although not directly holding that disciplinary-grievance procedures were

mandatorily negotiable, arose from a dispute between a municipality and its police officers' bargaining representative over the negotiability of disciplinary grievance procedures. In *Township of West Windsor v. Public Employment Relations Commission*, 78 *N.J.* 98, 393 *A.*2d 255 (1978), the police officers' representative, Patrolmen's Benevolent Association Local 130 (PBA), had instituted a PERC scope-of-negotiations proceeding because the Township had refused to incorporate in their bargaining agreement or to negotiate grievance procedures applicable to discipline imposed on officers for violations of departmental rules, the Township insisting that its unilaterally-adopted disciplinary procedure was exclusively applicable as a matter of managerial prerogative. The Township contended that discipline was not a term and condition of employment, and that the statutory mandate to " 'negotiate * * * grievance procedures by means of which * * * employees may appeal the interpretation, application or violation of policies, agreements and administrative decisions affecting them' " should be construed to apply only to subjects included in the collective-negotiations agreement. *Id.* at 117–18, 393 *A.*2d 255 (Conford, P.J.A.D. (temporarily assigned), dissenting) (quoting former *N.J.S.A.* 34:13A–5.3, *amended by L.* 1982, *c.* 103).

Without addressing specifically the disagreement between the parties, PERC's ruling apparently favored the PBA's position and rejected the township's contention that the duty to negotiate grievance procedures applied only to subjects mandatorily negotiable and encompassed within the PBA agreement. PERC held that the statutory mandate obligated public employers to negotiate procedures pursuant to which employees may appeal "the inter-. pretation, application or violation of policies, agreements and administrative decisions affecting them," irrespective of whether the subject was mandatorily negotiable or included in the bargaining agreement. *Id.* at 118, 393 *A.*2d 255. PERC noted that the parties could determine the extent of the grievance procedure and whether it should include binding arbitration. *Ibid.*

This Court affirmed but modified PERC's ruling, construing the statutory mandate to negotiate grievance procedures, *N.J.S.A.*

34:13A–5.3, "to refer only to grievances over the matters enumerated [that] affect the terms and conditions of employment." *Id.* at 115, 393 *A.*2d 255. We also noted that a consequence of our holding was that "the scope of mandatory grievability is substantially equivalent to the scope of mandatory negotiability." *Id.* at 115–16, 393 *A.*2d 255. However, observing that statutes and regulations setting forth terms and conditions of public employment cannot be contravened by collective negotiations, we concluded that such statutes and regulations are "effectively incorporated by reference as terms of any collective agreement covering employees to [whom] they apply." *Id.* at 116, 393 *A.*2d 255. Accordingly, disputes concerning the alleged violation of such statutes and regulations would be an appropriate subject of grievance procedures, and to that limited extent we concluded that grievability under the Act was more expansive than negotiability.

Implicit in the disagreement between PERC's disposition and our holding was the apparently-shared assumption that the determination of discipline for police officers who had violated departmental rules was a managerial prerogative not mandatorily negotiable as a term and condition of employment. That assumption was expressed explicitly in Judge Conford's dissent, which disagreed both with the Court's more restrictive view of the statutory duty to negotiate grievance procedures and with PERC's ruling to the extent that it would have allowed binding arbitration of disciplinary determinations:

> But I would qualify the power of the employer to agree to binding arbitration as the terminal stage of a grievance procedure if the subject matter of the grievance entailed the exercise of inherent managerial judgment or discretion. That, for example, would apply with respect to the disciplining of an employee policeman— the issue here directly presented. It would contravene public policy for an arbitrator to be enabled to supersede the discretionary determination of an administrative officer vested with statutory authority to determine the discipline to be imposed upon a policeman for an infraction of rules and regulations.

[*Id.* at 120, 393 *A.*2d 255.]

The question whether discipline of a police officer was cognizable as a grievance subject to binding arbitration was first ad-

dressed by the Appellate Division in *Borough of Stone Harbor v. Wildwood Local 59, Policemen's Benevolent Ass'n,* 164 *N.J.Super.* 375, 396 *A.2d* 607 (1978), *certif. denied,* 81 *N.J.* 270, 405 *A.2d* 815 (1979), in the context of an agreement in which the municipality reserved the right "to suspend, demote, discharge or take other disciplinary action for good and just cause." *Id.* 164 *N.J.Super.* at 379, 396 *A.2d* 607. Without considering the question whether the municipality's power to discipline police officers was a subject mandatorily negotiable under the Act, the Appellate Division determined that the binding arbitration procedure authorized by the agreement was incompatible with the Borough's reserved power over discipline. The court's reasoning, however, strongly reflected the view that the discipline of police officers was a matter of non-delegable governmental prerogative:

> This interpretation of the collective bargaining agreement is entirely consistent with a municipality's manifest responsibilities regarding the integrity and effectiveness of its local police force as reflected in our decisional law. Those in charge of a local police force have the responsibility "of sedulously maintaining departmental morale and discipline and adequate standards of service." The director of a police force has a duty to "rid his department of irresponsible members." So imperative is this responsibility that even the Civil Service Commission, a governmental agency, has sharply circumscribed powers of reviewing local disciplinary action of police officers. In obtaining the union's agreement that the right of discipline be reserved for its exclusive exercise, the municipality was doubtless aware of its heavy responsibility and was seeking the means by which it could be fulfilled. To entrust exercise of the right to determine when and how to discipline to a board of arbitrators whose decision would for all intents and purposes be insulated from any judicial review on its merits, *N.J.S.A.* 2A:24–8, would be to deprive the municipality of that to which it was entitled, the means of fulfilling its duty under the law.
>
> Hence, the agreement as we interpret it is in accord with normal expectations. To hold otherwise would render ineffective the municipality's reserved right of discipline and would compromise the power of the municipality to control morale and insure adequate standards of safety and performance.

[*Id.* at 382, 396 *A.2d* 607 (citations omitted).]

Subsequent to the Appellate Division's decision in *Stone Harbor,* and this Court's decision in *West Windsor,* PERC decided two scope-of-negotiations cases concerning the arbitrability of discipline: *In re State of New Jersey & Local 195, IFPTE & Local 518, SEIU,* 5 *NJPER* (Lab.Rel.Press) ¶ 10161 (PERC July 5,

1979), *rev'd, State v. Local 195, IFPTE,* 179 *N.J.Super.* 146, 430 *A.*2d 966 (App.Div.1981), *certif. denied,* 89 *N.J.* 433, 446 *A.*2d 158 (1982), and *In Re City of Jersey City & Jersey City Police Officers' Benevolent Ass'n,* 6 *NJPER* (Lab.Rel.Press) ¶ 11194 (PERC July 10, 1980), *rev'd, City of Jersey City v. Jersey City Police Officers' Benevolent Ass'n,* 179 *N.J.Super.* 137, 430 *A.*2d 961 (App.Div.1981), *certif. denied,* 89 *N.J.* 433, 446 *A.*2d 158 (1982). In the first case, disputes had arisen during contract negotiations between the State and local representatives of the International Federation of Professional and Technical Engineers, AFL–CIO, and of the Service Employees International Union over negotiability of binding arbitration procedures concerning the imposition of discipline, as well as over the negotiability of binding-arbitration procedures concerning minor disciplinary actions specifically exempted from the scope of Civil Service laws. Holding for the first time that discipline is a term and condition of employment and not a non-delegable matter of managerial prerogative, PERC ruled that public employers and employees may provide for binding arbitration of disciplinary disputes in a collective-negotiations agreement, and may also negotiate binding arbitration procedures for minor disciplinary actions exempted from the coverage of Civil Service statutes. *Local 195, IFPTE, supra,* 5 *NJPER* ¶ 10161.

In *Jersey City PBA,* the issue before PERC was the validity of a provision in the collective-negotiations agreement between Jersey City and its police officers' bargaining representative that authorized binding arbitration to review the reasonableness of discipline imposed on police officers for violations of departmental rules. The grievant was a police officer who had sustained a pay reduction because of his demotion from detective to uniformed status, and the designated arbitrator modified the discipline to preserve the officer's prior rate of pay. The City contended that the arbitrator's authority was limited to consideration of whether the violation had occurred, and that the reasonableness of discipline was a non-delegable subject of managerial prerogative and hence not amenable to arbitration. PERC rejected the City's contentions, holding that the reasonableness of a disciplinary

sanction imposed on a police officer involved a term and condition of employment, and that review of such sanctions by binding arbitration did not impermissibly interfere with the City's managerial prerogatives. 6 *NJPER* ¶ 11194.

The Appellate Division reversed both PERC rulings. In *Jersey City Police Officers' Benevolent Ass'n, supra,* 179 *N.J.Super.* 137, 430 *A.*2d 961, the Appellate Division categorically stated that "discipline of the members of a municipal police department is plainly a subject of essential inherent managerial prerogative [that] has been delegated by the Legislature to the municipality and cannot be negotiated away by agreement by the municipality." *Id.* at 138, 430 *A.*2d 961. Moreover, the court observed that for both Civil Service and non-Civil Service municipalities, procedures for disciplinary review had been statutorily mandated, relying on *N.J.S.A.* 11:22–24 (*repealed by L.* 1986, *c.* 112 (current provisions at *N.J.S.A.* 11A:2–13 to –22)) and *N.J.S.A.* 40A:14–150, and concluded that the statutorily-mandated procedures cannot be supplanted or modified by the submission to binding arbitration of the reasonableness of discipline imposed by the municipality. *Id.* at 138–39, 430 *A.*2d 961.

Less than two weeks after the filing of the opinion in *Jersey City PBA,* a different panel of the Appellate Division reversed PERC's ruling in the case involving the collective agreement with the Engineers' and Service Employees' unions. In *Local 195, IFPTE, supra,* 179 *N.J.Super.* 146, 430 *A.*2d 966, the Appellate Division determined for the first time that a public employer is not authorized to negotiate binding-arbitration procedures for disputes concerning disciplinary determinations affecting employees *other than police officers:*

The power to discipline a public employee for misconduct, incompetency, inefficiency or other good cause is one of the most significant powers reposed in public employers and is essential to the maintenance of an adequate, efficient and effective public work force. This power to discipline is also an integral and essential part of fundamental governmental policy. The public employers cannot effectively and efficiently perform their governmental functions and fulfill their obligations to the public if they do not have the power to discipline employees without the encumbrances of collective negotiations and binding arbitration.

*[Id.* at 152–53, 430 *A.*2d 966.]

Assembly Bill 706, which on reenactment after Governor Kean's conditional veto constituted the discipline amendment, was introduced in February 1982, approximately eight months after the Appellate Division decisions in *Jersey City PBA* and *Local 195, IFPTE.* The bill's legislative history states unequivocally that the Legislature's purpose in enacting the bill was to overrule the Appellate Division decision in *Local 195, IFPTE,* involving the engineers and service employees unions; but the legislative history contains no reference to the Appellate Division decision in *Jersey City PBA.* According to the sponsor's statement,

In June of 1981 the Appellate Division of the State Superior Court, in *State of New Jersey v. Local 195 IFPTE and Local 518, SEIU,* 179 *N.J.Super.* 146 [430 *A.*2d 966], ruled that disciplinary determinations did not fall within the scope of mandatory negotiations and that collective agreements could not, therefore, provide for the submission to binding arbitration of contested disciplinary actions.

This bill would overturn that court ruling so as to give meaning to the State Constitution's guarantee of the right of public employees to "present ... their grievances and proposals through representatives of their own choosing" (Article I, paragraph 19). The proposed legislation merely provides that administrative decisions affecting public employees—already clearly recognized by the court as negotiable—will be understood to encompass "disciplinary determinations" and that disciplinary review procedures as well as disciplinary disputes in general, will be a required subject of negotiations as a term and condition of employment. Disciplinary actions have an unquestionably intimate and direct effect on the work and welfare of public employees and should be viewed as only indirectly related to the right of public officials to determine substantive governmental or educational policy. The above amendments also empower public employers to negotiate binding arbitration procedures for disciplinary disputes. Under this bill, contractual provisions concerning disciplinary disputes could cover such basic issues as a review of the guilt or innocence of an employee with respect to both major and minor disciplinary infractions, and the standards for, and reasonableness of, any penalty imposed.

[Assembly Member Patero, Statement to Assembly Bill 706 (February 1, 1982).]

Similarly, the Senate State Government, Federal and Interstate Relations and Veterans Affairs Committee Statement to the bill confirms the Legislature's intention to overrule the *Local 195, IFPTE* decision:

This bill amends the "New Jersey Employer–Employee Relations Act" (*P.L.* 1968, *c.* 303) with respect to the negotiability of disciplinary disputes and disciplinary review procedures.

Prior to June, 1981, disciplinary review procedures were provided for in negotiated agreements between the State of New Jersey and representatives of public employee organizations. In a decision issued on June 2, 1981 the Appellate Division of the New Jersey Superior Court ruled that the "State was not obligated to submit disciplinary grievances to binding arbitration since State's disciplinary determinations involved inherent managerial prerogatives with respect to its public charge to maintain an adequate and efficient work force." *(State of New Jersey v. Local 195 IFPTE and Local 518, SEIU,* 179 *[N.J.] Super.* 146 [430 *A.*2d 966])

The bill accomplishes the following:

1. The amendatory language specifically establishes that disciplinary disputes are in the category of "terms and conditions of employment" and, as such, are subject to negotiations between employers and employees.

[Senate State Government, Federal and Interstate Relations and Veterans Affairs Committee, Statement to Assembly Bill 706 (March 8, 1982).]

Governor Kean's conditional-veto message expressed conceptual approval of the bill's objectives but recommended that the bill be amended to provide that negotiated disciplinary-dispute procedures not be available to those public employees already covered by tenure, statutory, or Civil Service appeal procedures. The veto message also disapproved provisions of the bill that would have permitted "public employees with tenure or civil service protection to negotiate for binding arbitration of those minor disciplinary procedures [that] are not covered by the tenure of civil service laws," a viewpoint consistent with one aspect of the Appellate Division's holding in *Jersey City PBA, supra,* 179 *N.J.Super.* at 138–39, 430 *A.*2d 961. Governor Kean, *Conditional–Veto Message to Assembly Bill 706,* May 3, 1982. The veto message recommended instead that "changes in the disciplinary procedures involving employees with special statutory protection be done in the context of reviewing those statutes." *Ibid.* The Legislature reenacted the bill to incorporate the recommendations in the Governor's veto message. *L.* 1982, *c.* 103.

■ As adopted, the discipline amendment would not appear to apply to municipal police officers either in Civil Service or in non-Civil Service communities, because of the availability of statutory appeal procedures for the review of discipline. *See N.J.S.A.* 11A:2–13 to –22; *N.J.S.A.* 40A:14–150. (Although the issue is not before us, we consider highly questionable the holdings in *Com-*

*munications Workers of America, AFL–CIO v. Public Employment Relations Commission,* 193 *N.J.Super.* 658, 475 *A.2d* 656 (App.Div.1984) and *Bergen County Law Enforcement Group v. Bergen County Board of Chosen Freeholders,* 191 *N.J.Super.* 319, 466 *A.2d* 963 (App.Div.1983), that the discipline amendment authorizes binding arbitration of minor disciplinary actions for which no appeal lies under the Civil Service statutes. As noted, Governor Kean's conditional-veto message concerning Assembly Bill 706 explicitly had rejected the provisions of that bill permitting negotiation for binding arbitration of minor disciplinary disputes not covered by the tenure or Civil Service laws, recommending instead that such concerns be addressed by amending the tenure and Civil Service Statutes.)

■ Furthermore, county police officers are not subject to the discipline amendment. Although a statutory appeal procedure has been provided for county employees not covered by Civil Service, *N.J.S.A.* 40A:9–25, we note that twenty of the twenty-one counties have elected to be covered by Civil Service, *see* N.J. Dep't of Personnel, *Annual Report 1991–1991,* at 43, and only four counties, all of which are subject to Civil Service, have county police departments. *See* State of N.J., Div. of State Police, *1992 Uniform Crime Report* 173–74. Because the grievance and disciplinary-review procedures authorized by the discipline amendment "may not replace or be inconsistent with any alternat[ive] statutory appeal procedure," *N.J.S.A.* 34:13A–5.3, the Civil Service appeal procedures applicable to those counties with county police departments also preclude application of the discipline amendment to county police departments.

We must therefore determine whether the only major police force to which the Legislature intended that the discipline amendment apply was the State Police.

### III

In *In re Carberry,* 114 *N.J.* 574, 556 *A.2d* 314 (1989), Justice Pollock's opinion for a unanimous court explained the justification

for the statutory delegation of authority over discipline to the Superintendent of the New Jersey Division of State Police:

The Division is established in the Department of Law and Public Safety, with the superintendent as the executive and administrative head of the Division. *N.J.S.A.* 52:17B–7. The Division satisfies the definition of "state agency" under the Administrative Procedure Act, *N.J.S.A.* 52:14B–2(a), and the superintendent, as the individual constituting the highest authority within the agency, is "the head of the agency" under that Act, *N.J.S.A.* 52:14B–2(d). As the head of the Division, the superintendent sets Division policy, *N.J.S.A.* 53:1–10, and subject to the approval of the Governor, makes the "rules and regulations for the discipline and control" of state police officers. *Ibid.* Consequently, the superintendent has the ultimate responsibility for maintaining discipline among state police officers. The weight of that responsibility becomes apparent on considering that state troopers are authorized to carry firearms, *N.J.S.A.* 2C:39–5 to –6(3), to use deadly force under justifiable circumstances, *N.J.S.A.* 2C:3–7, and to enforce law and order throughout the state. Given those responsibilities, the need of the superintendent to maintain discipline among the troopers is obvious.

[*Id.* at 578, 556 *A.*2d 314.]

In attempting to ascertain whether the Legislature intended the Superintendent's authority over discipline of State Police to be subject to the discipline amendment, we consider the statutory provisions that authorize and govern the operations of the Division. Originally established as the Department of State Police in 1921, *L.* 1921, *c.* 102, the State Police was reconstituted as the Division of State Police in the Department of Law and Public Safety, *L.* 1948, *c.* 439, codified at *N.J.S.A.* 52:17B–6. The executive and administrative head of the Division is the Superintendent of State Police, *N.J.S.A.* 52:17B–7, to be appointed by the Governor with the advice and consent of the Senate and to serve during the term of office of the appointing Governor. *Ibid.* Under the enabling legislation, *L.* 1921, *c.* 102, § 4, no person was eligible to hold a command position, including superintendent, deputy superintendent, troop captain or lieutenant, in the State Police without having served at least two years as a United States Army officer and having received an honorable discharge with a rank not lower than that of lieutenant. *See* Historical Note, *N.J.S.A.* 53:1–4. Although that requirement of prior military service has been eliminated, *L.* 1947, *c.* 65, § 4, other statutory and regulatory

provisions reflect the quasi-military orientation of the State Police and distinguish it from other agencies of state government.

Unlike police officers in municipalities subject to Civil Service whose appointment and promotions are governed by the merit-appointment process, see *N.J.S.A.* 11A:4–1 to –16 and *N.J.S.A.* 40A:14–122.4, applicants for appointments to the State Police are required to establish to the satisfaction of the Superintendent their mental and physical fitness and general qualifications. *N.J.S.A.* 53:1–9. State troopers are appointed and may be reappointed for two-year terms, *N.J.S.A.* 53:1–8, and after five years of continuous service may continue as members of the State Police "during good behavior." *N.J.S.A.* 53:1–8.1. That statutory scheme has been described as reflecting the legislative intention "to give the Superintendent a great deal of flexibility and reasonably unrestricted control in his preliminary evaluation of the members of the State Police force." *Dunbar v. Kelly,* 114 *N.J.Super.* 450, 453, 277 *A.*2d 224 (App.Div.), *certif. denied,* 59 *N.J.* 528, 284 *A.*2d 353 (1971). Moreover, unlike other public employees, a state trooper who withdraws from the force without the consent of the Superintendent commits a criminal offense. *N.J.S.A.* 53:1–11.

Beyond the statutory provisions governing organization of the Division, the detailed provisions of the *New Jersey State Police Rules and Regulations, supra,* violation of which sets in motion the State Police disciplinary procedures, demonstrate the paramilitary characteristics of the Division. The following examples extracted from the *Rules and Regulations* illustrate the point:

A member shall [ ] promptly obey any lawful order emanating from any superior or commissioned officer, superior non-commissioned officer, or other member placed by competent authority in a position of supervision over such member.

[*Rules and Regulations* art. IV, § 3(a).]

A member who is absent from duty without proper authority and remains absent for a period of ten scheduled working days or more shall be considered as having voluntarily withdrawn from the Division of State Police without the consent of the Superintendent and shall be classed as a deserter and may be dismissed, pursuant to law, from the Division of State Police.

### [*Id.* art. V, § 2.]

A member is subject to call to duty twenty-four hours a day and may be recalled from any authorized absence from duty, including vacation, whenever necessity demands.

### [*Id.* art. V, § 4.]

No member's duty shall be performed in a culpably inefficient manner. As used in this Section, culpably inefficient manner is that inefficiency for which there is no reasonable or just excuse.

### [*Id.* art. V, § 5.]

No member shall malinger or feign illness. A high degree of self-control is required at all times of every member. Concerted action and mutual protection are necessary in the proper performance of duty, and therefore no member shall shirk danger, avoid responsibility or manifest cowardice in the performance of duty.

### [*Id.* art. V, § 6.]

No member shall:

a.  Act or behave in an official capacity to the personal discredit of the member or to the discredit of the Division.

b.  Act or behave in an unofficial or private capacity to the personal discredit of the member or to the discredit of the Division.

c.  Act or behave in any capacity to the detriment of good order and discipline of the Division.

### [*Id.* art. VI, § 2.]

Those excerpts from the State Police Rules and Regulations strongly suggest that the responsibility for determining whether a trooper has committed a violation of the Rules and Regulations, and the discipline to be imposed therefor, are plainly matters of inherent managerial prerogative to be discharged by the Superintendent and his designated staff, and not appropriate subjects for delegation to an outside arbitrator. Unlike the comparably routine issues of discipline that might arise in connection with employees in other departments of state government, the discipline of state troopers implicates not only the proper conduct of those engaged in the most significant aspects of law enforcement, involv-

ing the public safety and the apprehension of dangerous criminals, but also the overall effectiveness, performance standards, and morale of the State Police. As such, discipline of state troopers involves the most profound and fundamental exercise of managerial prerogative and policy. As we explained in *Ridgefield Park, supra:*

> [T]he very foundation of representative democracy would be endangered if decisions on significant matters of governmental policy were left to the process of collective negotiation, where citizen participation is precluded. This Court would be most reluctant to sanction collective agreement on matters which are essentially managerial in nature, because the true managers are the people. Our democratic system demands that governmental bodies retain their accountability to the citizenry.

[78 *N.J.* at 163, 393 *A.*2d 278.]

Accordingly, we entertain no doubt that if the issue before us involved simply the negotiability under the Act of procedures, including binding arbitration, to review disciplinary determinations affecting State Troopers, putting aside the discipline amendment, our precedents abundantly demonstrate that the issue would be non-negotiable, because of the overwhelming likelihood that negotiability of such procedures would infringe unacceptably on one of the most important managerial prerogatives of the Superintendent. *See, e.g., Local 195, IFPTE, supra,* 88 *N.J.* at 404–05, 443 *A.*2d 187; *Board of Educ. v. Bernards Township Educ. Ass'n,* 79 *N.J.* 311, 321, 399 *A.*2d 620 (1979); *Ridgefield Park, supra,* 78 *N.J.* at 156, 393 *A.*2d 278; *West Windsor, supra,* 78 *N.J.* at 108–09, 393 *A.*2d 255; *State Supervisory Employees, supra,* 78 *N.J.* at 86–87, 393 *A.*2d 233. We are fully in accord with Judge Conford's observation in *West Windsor, supra:*

> It would contravene public policy for an arbitrator to be enabled to supersede the discretionary determination of an administrative officer vested with statutory authority to determine the discipline to be imposed upon a policeman for an infraction of rules and regulations.
>
> [78 *N.J.* at 120, 393 *A.*2d 255 (Conford, P.J.A.D. (temporarily assigned), dissenting).]

■ Despite the literal applicability of the discipline amendment to all public employers whose employees are unprotected by Civil

Service or tenure laws and whose discipline is not subject to alternative statutory procedures, *N.J.S.A.* 34:13A–5.3, we are thoroughly convinced that the Legislature did not intend the discipline amendment to apply to the State Police, and we now so hold. Our conclusion is reinforced by Judge Learned Hand's classic admonition that "[t]here is no surer way to misread any document than to read it literally." *Guiseppi v. Walling*, 144 *F.*2d 608, 624 (2d Cir.1944). As we observed in *Schierstead v. Brigantine*, *supra*, "statutes are to read sensibly rather than literally and the controlling legislative intent is to be presumed as 'consonant to reason and good discretion.'" 29 *N.J.* at 230, 148 *A.*2d 591 (quoting *Morris Canal & Banking Co. v. Central R.R. Co.*, 15 *N.J.Eq.* 419, 428 (Ch. 1863)). We attach considerable significance to the fact that although the Appellate Division decided *Jersey City PBA*, *supra*, 179 *N.J.Super.* 137, 430 *A.*2d 961, only two weeks before it decided *Local 195, IFPTE*, *supra*, 179 *N.J.Super.* 146, 430 *A.*2d 966, the legislative history of the discipline amendment expresses emphatically the Legislature's intention to overrule only the *Local 195, IFPTE* decision, involving the engineers and supervisory employees union, and omits any mention whatsoever of the Appellate Division's identical holding in *Jersey City PBA*, involving a police union. Moreover, as explained above, *supra* at 412–414, 634 *A.*2d at 489–490, because of the provisions of Governor Kean's conditional veto message acquiesced in by the Legislature, the discipline amendment was not intended to apply either to municipal or county police departments. We cannot conceive that the Legislature intended the discipline amendment to apply to only the State Police and to no other major police department in the State.

Although the Appellate Division noted that the discipline amendment "forced nothing upon [public employers]," 260 *N.J.Super.* at 278, 615 *A.*2d 1286, and "simply permits a willing employer to agree to a procedure by which a neutral arbitrator may review the fairness of minor command discipline," *id.* at 281, 615 *A.*2d 1286, those observations do not take into account the 1977 amendments to the Act, *L.* 1977, *c.* 85, providing for compulsory arbitra-

tion of labor disputes involving public fire and police departments. *See N.J.S.A.* 34:13A–14 to –21. As counsel for PERC acknowledged during oral argument, the compulsory "interest arbitration" provisions of the Act apply to the State Police. *See also N.J.S.A.* 34:13A–15 (including state troopers in definition of "public police department"). Hence, if the discipline amendment applies and the State Police were obligated to negotiate disciplinary-review procedures, the "interest arbitration" provisions of the Act could result in an arbitrator being empowered to choose between the last offers submitted by the State Police and by the troopers' representative on the issue of disciplinary-review procedures, *N.J.S.A.* 34:13A–16(c)(6), subject to the special statutory standards applicable to interest arbitration. *N.J.S.A.* 34:13A–16(g). "In 'interest' arbitration, the arbitrator is in fact empowered to create the terms of labor contracts to which municipalities would otherwise have to give their approval." *Kearny PBA Local $ 21 v. Town of Kearny,* 81 *N.J.* 208, 229, 405 *A.2d* 393 (1979) (Pashman, J., concurring). We deem it most unlikely that the Legislature deliberately would have subjected the State Police to a process in which an outside arbitrator could impose on the Division a disciplinary-review procedure including binding arbitration that was unacceptable to the Superintendent.

We acknowledge the Appellate Division's observation that although troopers can challenge removals from the Division by appeals to the Appellate Division, see *N.J.S.A.* 52:14–17.2 and *In re Carberry, supra,* 114 *N.J.* at 582, 556 *A.2d* 314, "[n]o other statute defines or guarantees a procedure through which troopers can appeal or challenge other, lesser discipline." 260 *N.J.Super.* at 279, 615 *A.2d* 1286. We note that under the negotiated agreement in effect when this litigation arose, grievances relating to written reprimands imposed on troopers were subject to review by the Superintendent and, if requested, by the Attorney General. The Rules and Regulations provide that discipline recommended after Summary or General Disciplinary Hearings is subject to review by the Superintendent. In view of the underlying concerns highlighted by this litigation, the Division may consider appropriate a reassessment of the procedures currently in place for the review of disciplinary impositions to ensure that the interests of both the Division and the troopers adequately are protected.

In the event that the Legislature disagrees with our assessment of the intended scope of the discipline amendment, it is of course empowered to enact clarifying legislation. We hold only that on the basis of the legislative history explaining the purpose of the 1982 discipline amendment, including specifically the Governor's conditional-veto message, together with the development to that date of decisional law interpreting the question of negotiability under the New Jersey Employer–Employee Relations Act, we cannot conclude that the Legislature intended to subject the State Police to the provisions of the discipline amendment.

The judgment of the Appellate Division is reversed.

*For reversal*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, and GARIBALDI—7.

*Opposed*—None.