**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4438-17T2

IN THE MATTER OF TROOPER 1
WILLIAM CARVOUNIS #6165.

_____

Argued April 30, 2019 – Decided June 3, 2019

Before Judges Hoffman, Suter and Geiger.

On appeal from the New Jersey Division of State Police, Docket No. 2014-0015.

Christopher A. Gray argued the cause for appellant William Carvounis (Sciarra & Catrambone, LLC, attorneys; Charles J. Sciarra, of counsel; Christopher A. Gray, on the briefs).

Christopher J. Hamner, Deputy Attorney General, argued the cause for respondent Division of State Police (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Christopher J. Hamner, on the brief).

PER CURIAM

Appellant New Jersey State Trooper William Carvounis appeals from the May 16, 2018 final decision of Acting Superintendent Patrick J. Callahan that terminated Carvounis for misconduct.  We affirm.

I.

The record discloses the following facts and procedural history leading to the disciplinary action under review.

Carvounis was charged with violating three of the Rules and Regulations of the Division of State Police (Division).  Charge 1 alleged a violation of Article XI, Section 4, which reads:  "No member shall violate the laws, statutes or ordinances of the United States, its territories or possessions or of any state or any political subdivision thereof."  Charge 2 alleged a violation of Article VI, Section 2.b., which reads:  "No member shall act or behave in an unofficial or private capacity to the personal discredit of the member or to the discredit of the Division."  Charge 3 alleged a violation of Article XIII, Section 15, which reads: "No member should use or attempt to use such member's official position to secure unwarranted privileges or advantages for such member or others."

Carvounis contested the charges.  The matter was transmitted to the Office of Administrative Law (OAL) as a contested case and assigned to an Administrative Law Judge (ALJ) for hearing.  Hearings were held on July 23

and July 24, 2015. The record remained open for submission of post-hearing briefs and documentary evidence, and closed on February 10, 2016. Following multiple extensions, the ALJ issued her Initial Decision on April 5, 2018.

The ALJ made the following factual findings pertinent to our analysis:

> Many of the material facts in this matter are not in dispute. In January 2014, Carvounis was assigned to the Executive Protection Bureau of the Governor's Security Unit. On January 8, 2014, he traveled with friends to a Cabela's Outfitters, a sporting goods store in Hamburg, Pennsylvania. While at the store he removed items from their packaging and placed them in his cargo-pants pockets. After removing the packaging, he placed the empty packages in other parts of the store. He also took two differently priced items and switched packages so that a binocular strap valued at $29.99 was incorrectly priced at $19.99. Further, as he walked toward the checkout he removed the price tag on a cap and placed the cap on his head.
>
> The total cost of the items concealed from Cabela's at checkout was $277.38. At the checkout Carvounis purchased approximately $200 worth of merchandise, but did not take the concealed items from his pocket, nor did he inform the cashier that he was purchasing the cap on his head. As he tried to exit the store, a Cabela's loss-prevention agent and assistant store manager stopped him, along with an officer of the Tilden Township Police Department. He was taken to the asset-protection office in the store and, after an interview, charged with retail theft under Pennsylvania law. Specifically, he was charged with two counts of retail theft, a Class B misdemeanor. On February 10, 2014, Carvounis applied for and was accepted into Pennsylvania's Accelerated Rehabilitative Disposition

(ARD) program. He completed all conditions of the program on August 25, 2014, and all charges were dismissed and his arrest records were expunged.

. . . .

The Division then presented the testimony of Barbara Smith, who was a loss-prevention agent for Cabela's at the time of the incident. She described her duties at the store in Hamburg and the store's extensive surveillance-camera footage. It was that surveillance-camera coverage that led to her spotting Carvounis's activity in the store that day. She noticed him as she was monitoring the surveillance cameras. Smith testified as to her observations of Carvounis and the report on the incident that she authored. After observing his actions in secreting items in his cargo pants, placing the packaging for those items throughout the store, and changing prices on items, she and other employees and Officer Schwoyer confronted him after he had exited the store. She stated that it is Cabela's policy to wait until the patron exits the store, in the event the patron changes his mind and returns with the items. Carvounis was then escorted to an office on the premises where he was interviewed by . . . assistant manager for asset protection Jared Taggart, and Schwoyer.

At the start of the interview Carvounis was asked for his identification, and when he produced his driver's license he also produced his Division ID. Taggart returned them to him, and he was asked if he had weapons on his person. Schwoyer then took Carvounis's gun and a knife from him, and the interview continued. According to Smith, Carvounis first stated that he did not know why he was there, and he was asked to empty his pockets. When the "product" was taken out of his pockets he first stated that he had

4

brought the eight stolen items in with him. He was then confronted with the empty packaging that Taggart had retrieved from the retail floor. Smith stated that Carvounis stopped arguing at that point and began to describe his duties at the Division, including being on the Governor's detail. He also stated that the items were for his use on the job, and that he needed to purchase them himself due to budgetary cutbacks. Carvounis asked that he be charged with an amount under $150, which constituted a lesser offense under Pennsylvania law. Smith further testified that Carvounis asked Schwoyer for professional courtesy in the matter. At the end of the interview Carvounis left with Schwoyer, and he was charged with retail theft, as Smith put it, like anyone else.

. . . .

In further discussing the statements he made in the Cabela's interview, Carvounis described his state of mind as being in shock. He said his reactions were the result of panic as everything came crashing down on him. He did admit to playing "dumb" at first. He said his State Police ID came out of his wallet when he produced his driver's license. According to Carvounis, it was Schwoyer who asked him for more information on his duties as a State trooper. As to his request that he not be charged with a theft over $150, he recalled Taggart explaining what offenses he could be charged with, and his request was merely in response to that explanation. As to his request for professional courtesy, he stated that he asked everyone in the interview room for help with his situation.

Carvounis testified that the theft occurred during a period of extreme personal and work stress in his life. It was his first day off in a while, and he and his family

A-4438-17T2

were going through tough financial times as he attempted to help his mother maintain her residence.

The ALJ found Carvounis guilty of Charges 1 and 3, but not guilty of Charge 2 because he was not acting in his official capacity. The ALJ explained that Carvounis "was on his day off, not on duty, and not performing his official duties. While he invoked his status as a State trooper in discussions at Cabela's, he was not acting in his official capacity." While recognizing the infractions were serious, the ALJ found the evidence presented in mitigation of penalty to be substantial. Taking into account Carvounis's service record, acceptance of responsibility, and character testimonials, the ALJ determined the "more appropriate penalty" was a suspension until the date of the Initial Decision.

Both parties filed written exceptions. On May 16, 2018, the Acting Superintendent issued a final decision adopting in part, rejecting in part, and modifying in part the Initial Decision. The Acting Superintendent adopted the ALJ's guilty findings on Charges 1 and 3, rejected the not guilty finding on Charge 2, and modified the recommended penalty of suspension to termination from employment with the Division. In reaching those determinations, the Acting Superintendent engaged in the following analysis:

> The record in this case is clear that Trooper Carvounis'[s] actions failed to meet these exacting standards. It is undisputed that he engaged in

shoplifting. Further, when confronted with this crime, he initially stated that he did not know the reason that he was detained from leaving the sporting goods store. In addition, as found by [the ALJ,] he contended "that the stolen items were for his use at work due to budgetary cutbacks." Further, he sought favorable treatment due to his status as a State Trooper.

. . . .

In this matter, [the ALJ] determined, based upon the above-conduct, that Trooper Carvounis "acted in a manner that discredited himself." Therefore, the prerequisite for a guilty determination of Charge #2 has been satisfied. Similarly, Trooper Carvounis'[s] aforementioned conduct also satisfies the separate element of this Charge of acting "to the discredit of the Division[.]"

Moreover, the basis for [the ALJ's] not guilty finding for this charge was that Trooper Carvounis was off duty. However, there is no requirement in Charge #2, Article VI, Section 2.b to [be] acting in an official capacity. It appears that [the ALJ] inadvertently applied the official capacity standard set out in Article VI, Section 2(a). Thus, the duty status of Trooper Carvounis at the time of the theft is irrelevant for the purpose of assessing his guilt to Charge #2.

Therefore, for all of the above-reasons, [the ALJ's] not guilty determination as to Charge #2 is hereby rejected.

. . . .

In this case, [the ALJ] recommended the suspension of Trooper Carvounis. However, in light of the nature of the actions of Trooper Carvounis, such a

7

penalty is insufficient. As previously noted, a State Trooper is held to a higher code of conduct, whether on or off duty. In this case, Trooper Carvounis failed to meet this threshold.

There is no dispute that Trooper Carvounis engaged in shoplifting, an illegal act, of goods that exceeded $200. In Pennsylvania, this conduct is classified as a misdemeanor offense. However, the equivalent offense in New Jersey is a fourth degree crime. N.J.S.A. 2C:20-11(c)(3). Thus, this conduct alone, shoplifting, constitutes a serious breach of the standard of behavior required of a State Trooper. However, Trooper Carvounis'[s] misconduct did not end upon his detention by store employees and the local police officer for shoplifting as he exited the sporting goods store. Rather, he compounded his misconduct through a series of additional actions.

Trooper Carvounis initially informed the store employees that he did not know the reason he was detained after exiting the store. This comment belies the various items that he had concealed in the pockets of his pants. Moreover, he stated that the goods in his possession were his own property. This assertion was contradicted by the empty packaging retrieved by the store employee. In addition, he also maintained that he needed these items for his position as a State Trooper due to budget cuts. Further, he contended that he told the cashier to charge him for the hat that was on his head. This assertion was directly contradicted by the store employee. Trooper Carvounis also requested that the store lower the value of the goods so that the total value would not exceed the threshold for a more serious criminal charge.

Trooper Carvounis also engaged in additional unacceptable conduct. He sought to utilize his position

A-4438-17T2

for favorable treatment. During his interview with the store employees and Officer Schwoyer, Trooper Carvounis discussed his duties as a State Trooper and requested "professional courtesy."

. . . .

Here, Trooper Carvounis, a law enforcement officer in this State, failed to adhere to the laws by engaging in shoplifting. Further, his subsequent misconduct also violated the standards of integrity and professionalism required of a State Trooper. Trooper Carvounis'[s] actions stand in direct contradiction to the conduct expected and required of State Troopers. In addition, his misconduct jeopardized the public's trust in the State Police.

Therefore, for all the above-reasons, the penalty of suspension recommended by [the ALJ] must be modified. In light of the gravity of Trooper Carvounis'[s] actions, the appropriate penalty in this matter is termination from employment with the New Jersey State Police.

This appeal followed.

## II.

Established precedents guide our task on appeal. Appellate review of an administrative agency decision is limited. In re Herrmann, 192 N.J. 19, 27 (2007). A strong presumption of reasonableness attaches to the Superintendent's decision. In re Carroll, 339 N.J. Super. 429, 437 (App. Div. 2001). The burden

is on appellant to demonstrate grounds for reversal. McGowan v. N.J. State Parole Bd., 347 N.J. Super. 544, 563 (App. Div. 2002).

"Appellate courts ordinarily accord deference to final agency actions, reversing those actions if they are 'arbitrary, capricious or unreasonable or [if the action] is not supported by substantial credible evidence in the record as a whole.'" N.J. Soc'y for the Prev. of Cruelty to Animals v. N.J. Dep't of Agric., 196 N.J. 366, 384-85 (2008) (alteration in original) (quoting Henry v. Rahway State Prison, 81 N.J. 571, 579-80 (1980)).

Under the arbitrary, capricious, and unreasonable standard, our scope of review is guided by three major inquiries: (l) whether the agency's decision conforms with relevant law; (2) whether the decision is supported by substantial credible evidence in the record; and (3) whether in applying the law to the facts, the administrative agency clearly erred in reaching its conclusion. In re Stallworth, 208 N.J. 182, 194 (2011).

When an agency decision satisfies such criteria, we accord substantial deference to the agency's fact-finding and legal conclusions, while acknowledging the agency's "expertise and superior knowledge of a particular field." Circus Liquors, Inc. v. Governing Body of Middletown Twp., 199 N.J. 1, 10 (2009) (quoting Greenwood v. State Police Training Ctr., 127 N.J. 500,

513 (1992)). We will not substitute our judgment for the agency's even though we might have reached a different conclusion. Stallworth, 208 N.J. at 194.

This same deferential standard applies to our review of the agency's choice of a disciplinary sanction. Id. at 195. We review discipline only to determine whether the "punishment is so disproportionate to the offense, in the light of all of the circumstances, as to be shocking to one's sense of fairness." Ibid. (quoting In re Carter, 191 N.J. 474, 484 (2007)).

## III.

With those principles in mind, we turn to Carvounis's contentions. Carvounis argues the Acting Superintendent's decision to modify the penalty from suspension to termination is shocking to one's sense of fairness. We disagree.

"[T]he responsibility for determining whether a trooper has committed a violation of the Rules and Regulations, and the discipline to be imposed therefor, are plainly matters of inherent managerial prerogative to be discharged by the Superintendent and his designated staff." State v. State Troopers Fraternal Ass'n, 134 N.J. 393, 416 (1993). The Court noted that unlike the discipline of State employees in other departments, "the discipline of state troopers implicates not only the proper conduct of those engaged in the most significant aspects of

11                                                      A-4438-17T2

law enforcement, involving the public safety and the apprehension of dangerous criminals, but also the overall effectiveness, performance standards, and morale of the State Police." Id. at 416-17.

Law enforcement officers are held to a higher standard of conduct than other public employees, and are obliged to act in a reasonable manner. In re Phillips, 117 N.J. 567, 576-77 (1990). Law enforcement officers "must present an image of personal integrity and dependability in order to have the respect of the public." Moorestown Twp. v. Armstrong, 89 N.J. Super. 560, 566 (App. Div. 1965). "Every police officer has an inherent duty to obey the law" and serve with "honesty, integrity and good faith." State v. Stevens, 203 N.J. Super. 59, 65, 66 (Law Div. 1984). This higher standard of conduct applies to the behavior of law enforcement officers on or off-duty. Phillips, 117 N.J. at 577.

The theft of merchandise exceeding $200 in value would have been a fourth-degree crime if committed in New Jersey. N.J.S.A. 2C:20-11(c)(3). The fact that the charge was diverted into a program similar to pre-trial intervention, dismissed after completion of the diversionary program, and subsequently expunged, does not diminish its seriousness or the impact on the Division.

Unfortunately, Carvounis's misconduct did not end with the theft. He compounded his misconduct by falsely claiming the stolen items belonged to

12

him, and then claiming the stolen items were needed for work due to budgetary cutbacks. He further compounded his misconduct by requesting special treatment in the form of professional courtesy by virtue of his position.

We recognize that Carvounis was never previously disciplined and was respected in the Division. While the absence of prior discipline was considered by the Acting Superintendent, the serious nature of Carvounis's conduct led to the decision to terminate him.

"[P]rogressive discipline is a worthy principle but it is not subject to universal application when determining a disciplined employee's quantum of discipline." Herrmann, 192 N.J. at 36. "[P]rogressive discipline is not a necessary consideration . . . when the misconduct is severe, when it is unbecoming to the employee's position or renders the employee unsuitable for continuation in the position, or when application of the principle would be contrary to the public interest." Id. at 33. "Our appellate courts also have upheld dismissal of employees, without regard to whether the employees have had substantial past disciplinary records, for engaging in conduct that is unbecoming to the position." Id. at 34.

"We are mindful of the special status of the Division of State Police and the special standards of discipline that apply to its members, and of the

Superintendent's duty to maintain discipline among the troopers as one means of promoting the public interest and safety." Div. of State Police v. Jiras, 305 N.J. Super. 476, 481 (App. Div. 1997) (citations omitted). Considering the Division's need to maintain order and discipline among its troopers, we decline to substitute our judgment for that of the Acting Superintendent, "especially where considerations of public policy are implicated." Id. at 482. We see no reason to depart from that standard in this case.

The findings and conclusions reached by the Acting Superintendent are supported by substantial, credible evidence in the record. Termination for Charges 1, 2, and 3 is not so disproportionate to the offenses as to be shocking to our sense of fairness, and we see no reason to disturb the Acting Superintendent's decision. The final decision was not arbitrary, capricious, or unreasonable.

Carvounis's remaining arguments are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-4438-17T2